## J. EARL ODEN AND EDITH ODEN, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Dockets Nos. 5546–67, 293–68, 294–68.   Filed June 21, 1971.

*Joe P. Mathews*, for the petitioners.
*John W. Dierker*, for the respondent.

IRWIN, *Judge:* The Commissioner determined deficiencies in income tax as follows:

| Docket No. | Year | Amount |
| --- | --- | --- |
| 5546–67 | 1963 | $16, 843. 16 |
| 293–68 | 1963 | 17, 360. 9 |
| 294–68 | 1963 | 9, 755. 9 |

The only issue for decision is whether petitioners were entitled to use the installment method of reporting income as provided in section 453 of the Internal Revenue Code of 1954.[2]

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties. The stipulation and the exhibits attached thereto are incorporated herein by this reference.

Petitioners are J. Earl Oden (hereinafter Earl) and his wife Edith Oden, John S. Braziel (hereinafter John) and his wife Betty Braziel, and James Ray Oden (hereinafter James) and his wife Patsy C. Oden.

---

[1] The proceedings of the following petitioners are consolidated herewith: John S. Braziel and Betty Braziel, docket No. 293–68; and James Ray Oden and Pasty C. Oden, docket No. 294–68.

[2] All statutory references are to the Internal Revenue Code of 1954, as in effect during the year at issue, unless otherwise indicated.

Each of the aforementioned couples filed a joint Federal income tax return for the taxable year 1963 with the district director of internal revenue in Dallas, Tex.

James and his wife resided in Abilene, Tex., at the time of the filing of the petitions herein, whereas the other petitioners resided in Comanche, Tex., at that time.

During the year at issue, Earl, John, and James were equal partners in the partnership of Oden, Braziel & Oden (hereinafter sometimes referred to as O.B. & O.). They also owned the following interests in the Choice Baking Co., Inc. (hereinafter Choice):

|  | Stock ownership (shares) |
|---|---|
| Earl | 400 |
| John | 400 |
| James | 200 |
| Total | 1,000 |

On April 1, 1961, Choice, with the consent of its shareholders, elected to be taxed under section 1372, thereby causing the stockholders to be taxed as individuals in accordance with the provision of subchapter S of the Internal Revenue Code of 1954. This election was effective during the year at issue.

On February 15, 1963, Choice and the O.B. & O. partners agreed to sell certain personal and real property for a total consideration of $364,457 to the Norris Dairy Products Co., Inc. (hereinafter Norris Dairy), and to the Norris Dairy Products Co. Employees' Profit Sharing Trust (hereinafter Norris Trust).[3]

Of this total purchase price, Norris Trust agreed to pay $112,000 while Norris Dairy agreed to pay the remainder.[4]

On the closing date, March 18, 1963, Norris Dairy paid $23,000 in cash[5] toward its obligation and executed a promissory note in the amount of $229,457 to the order of Choice, Earl, James, and John. This note was payable in three consecutive annual installments as follows:

| Due date | Amount due |
|---|---|
| February 15, 1964 | $76,485.66 |
| February 15, 1965 | 76,485.66 |
| February 15, 1966 | 76,485.68 |

The note provided that there would be no interest on any installment prior to its maturity. However, it further stated that each install-

[3] Norris Dairy and Norris Trust will sometimes hereinafter be referred to collectively as Norris.

[4] Although the original contract of sale obligated the Huggins-Knecht Leasing Co., Inc., to pay $229,457 toward the purchase price, an amendment thereto substituted Norris Dairy as the obligor therefor.

[5] Actually, the $23,000 cash payment was made as follows: Norris paid in full two promisory notes executed by Choice to State National Bank in Commanche, Tex.

ment of the note would draw interest from the date due until paid at the rate of 10 percent per annum.

The document purporting to be an agreement to sell was dated February 15, 1963, and provided that the promissory note was to be secured as follows: Norris Dairy agreed to place with the Mercantile National Bank in Dallas (hereinafter sometimes referred to as Mercantile National) three certificates of deposit [6] (hereinafter sometimes referred to as certificates) issued by the First National Bank of Dallas (hereinafter referred to sometimes as First National), each certificate being in an amount equal to one-third of the total principal amount of the note. This document was explicit with respect to these certificates and it stated as follows:

These certificates of deposit are to be payable to the order of * * * [Norris Dairy] on the dates that each installment payment is due on the note. It is agreed that these certificates of deposit shall be subject to a first chattel mortgage or pledge lien in favor of Sellers. As long as said note is not in default the interest [7] accruing on said certificates * * * shall belong to and be the property of * * * [Norris Dairy] and may be drawn by * * * [Norris Dairy].

The Norris Trust also executed a promissory note on the closing date in the amount of $112,000. This note was identical to the note executed by the Norris Dairy in all but one respect: it was payable in five, rather than three, consecutive annual installments. The due date and amount of each installment were:

| Due date | Amount due |
|---|---|
| Feb. 15, 1964 | $33,600 |
| Feb. 15, 1965 | 19,600 |
| Feb. 15, 1966 | 19,600 |
| Feb. 15, 1967 | 19,600 |
| Feb. 15, 1968 | 19,600 |

The document dated February 15, 1963, also recited that this note would be secured by certificates of deposit, each certificate having a principal amount and maturity date corresponding to the principal amount and maturity date of each installment of the note. The interest, at the rate of 3½ percent per year, on these certificates was payable to the Norris Trust, unless it was in default on its note. These certificates were likewise placed in escrow with Mercantile National.

On March 18, 1963, Norris signed a document called a collateral pledge agreement which stated that the pledged property consisted of the eight certificates of deposit described heretofore. Moreover, this document specifically recited that Choice and the O.B. & O. partners had a first and superior lien on the pledged property, but that they were not considered the owners thereof.

---

[6] A certificate of deposit is a negotiable instrument which is set up to mature on a specific date in the future and which can bear interest.

[7] Interest on the certificates was computed at the rate of 3½ percent.

The escrow agreement, dated March 19, 1963, and entered into by Norris, Choice, Earl, James, John, and Mercantile National provided, in pertinent part, as follows:

2. Escrow Holder [8] shall not surrender possession of any of said certificates of deposit to any person or party whatever except as follows:

(a). Upon receipt by Escrow Holder of cash or a Bank Cashier's check payable either to Escrow Holder or Pledgees [9] not later than three (3) days after the due date of each of the certificates of deposit described above in an amount equal to the principal amount of such certificates as are then due, then Escrow Holder shall release and deliver to Pledgors [10] such certificates or certificate as are then due and remit to Pledgees, in care of State National Bank, Comanche, Texas, the amount or bank cashier's check payable to Pledgees which has been received by Escrow Holder.

The certificates of deposit were endorsed in blank when they were deposited in escrow.

Despite the procedure outlined in the escrow agreement, on at least each of two occasions that a certificate of deposit became due, the certificate was presented to First National for payment by a messenger of Mercantile National with the following instructions:

your instructions [are] to cause to be issued your bank's cashier's check for the principal sum of the Certificate of Deposit payable as follows:

Choice Baking Company, Inc., J. E. Oden; James Oden and J. S. Braziel Interest at 3½ percent which has been earned to the maturity is to be credited to the commercial account with your bank of Norris * * *

It was the usual practice of Mercantile National to present each matured certificate for payment and to have the principal amount thereof issued to petitioners regardless of whether Norris was in default on the notes.

The parties to the sale intended and agreed that the certificates of deposit were to be presented for payment at maturity and that the proceeds therefrom were to be released as payment to the sellers immediately thereafter.

All the transactions in connection with the certificates of deposit were entered into the accounting books of Norris which relied upon First National and Mercantile National to handle the collection of the certificates of deposit as they became due.

The First National Bank of Dallas made a loan to Norris in connection with the purchase of assets in question. This loan, which was personally guaranteed by Stanley Norris, the president and sole stockholder of Norris Dairy, was not secured in any respect by the certificates of deposit. In fact, First National waived any rights it might

---

[8] Mercantile National.

[9] Choice and O.B. & O. partners.

[10] Norris Dairy and Norris Trust.

have had against the certificates. Norris used part or all of this loan to obtain the certificates in question from First National.

It was the sellers who insisted that the buyers purchase certificates of deposit. Insofar as the buyers were concerned they had no preference as to which maturity dates were to be put on the certificates.

OPINION

On February 15, 1963, Choice and the O.B. & O. partners, viz, the petitioners herein, agreed to sell certain personal and real property for a total consideration of $364,457 to Norris. Norris paid $23,000 in cash on the closing date and executed promissory notes payable in five consecutive annual installments. Documents purporting to be formal agreements provided that these notes were secured by certificates of deposit, each certificate having a principal amount and maturity date corresponding to the principal amount and maturity date of each installment of the notes. The certificates were endorsed in blank and deposited in escrow with the Mercantile National Bank in Dallas.

The sellers in question elected to report the sale on the installment method. Respondent determined that petitioners [11] were not entitled to report the sale in that manner.

Section 453,[12] the installment method of reporting income, was enacted for the purpose of permitting the taxpayer to spread the tax due as a result of the sale of certain types of property over the period during which payments of the sale price are made, thereby enabling "the seller to actually realize the profit arising out of each installment before the tax [is] * * * paid so that the tax could be

---

[11] Choice is not a petitioner herein since it elected, with the consent of its shareholders, to be taxed under subch. S of the Internal Revenue Code. However, its three stockholders and their wives are petitioners herein.

[12] Sec. 453 provides, in pertinent part, as follows:

SEC. 453. INSTALLMENT METHOD

(a) DEALERS IN PERSONAL PROPERTY.—

(1) IN GENERAL.—Under regulations prescribed by the Secretary or his delegate, a person who * * * sells * * * property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

*     *     *     *     *     *     *

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—

(1) GENERAL RULE.—INCOME FROM—

(A) a sale or other disposition of real property, * * *

*     *     *     *     *     *     *

(2) LIMITATION.—Paragraph (1) shall apply—

(A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 * * * only if in the taxable year of the sale or other disposition—

(i) there are no payments, or

(ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

paid from the proceeds collected rather than be advanced by the taxpayer." *Everett Pozzi*, 49 T.C. 119, 126 (1967).

Since the provisions allowing the use of the installment method of reporting income are relief provisions and exceptions to the general rule as to the year for reporting income, they must be strictly construed. *Cappel House Furnishing Co.* v. *United States*, 244 F. 2d 525, 529 (C.A. 6, 1957); *Everett Pozzi, supra* at 127; and *Blum's, Incorporated*, 17 B.T.A. 386, 389 (1929).

As we noted in *Everett Pozzi*,[13] *supra*, a "transaction purporting to be a sale on the installment basis that lacks reality will be no more effective in avoiding taxes than any other type of sale." See also *Griffiths* v. *Commissioner*, 308 U.S. 355 (1939), and *Williams* v. *United States*, 219 F. 2d 523 (C.A. 5, 1955).

Respondent sets forth in his brief two alternative theories to support his determination. He first contends that the entire proceeds of the sale were available to petitioners in the year of sale because Norris was ready, willing, and able to pay cash, but petitioners insisted on certificates of deposit and dictated the maturity dates thereof. Alternatively, respondent asserts that the promissory notes served no purpose, but were a nullity. This argument is summarized on brief as follows:

Here we do not have a true obligation of the purchaser. On the contrary, his obligation was fully met at the time he purchased the certificates of deposit and endorsed them in blank. The petitioners thus received not an obligation of the purchasers but a right to the certificates of deposit. The certificates had value on the date of sale. This value would probably be the face amount but in any event would certainly be in excess of 30% of the face amount. Thus petitioners would have received cash or its equivalent in an amount in excess of 30% of the purchase price.

---

[13] In the *Pozzi* case, petitioner agreed in 1963 to sell to the buyer a ready-mix concrete plant and business which he had operated as a sole proprietorship. At the time petitioner agreed to make the sale, it was the desire and intention of the buyer to make a cash payment of the total sales price of $200,000. Petitioner insisted that the sale be made on an installment basis and would not accept in cash the total sales price. Moreover, he wanted as security for the buyer's note for the unpaid portion of the sale price not only the properties involved in the sale, but additional security.

Extended negotiations ensued which resulted in the execution of a new agreement between petitioner and the buyer whereby the latter agreed to pay the total purchase price, with interest at 6 percent per year, in 20 successive installments semiannually.

A sum equal to the full purchase price was deposited in cash into an escrow account as collateral security. The escrow holder purchased immediately thereafter five time certificates of deposit due on five separate dates. Four of the certificates were correlated to mature on four of the dates that installments were due on the purchase price.

The buyer paid the escrow holder each installment due on the purchase price. The escrow holder, after receipt of each installment, issued a check payable to the seller. Immediately thereafter, the escrow holder redeemed the certificates of deposit, plus the accrued interest thereon, and paid the proceeds to the buyer.

We held on those facts that the sale did not constitute a true statutory installment sale. Therefore, petitioner was not entitled to report the gain from the sale on the installment basis, but rather was required to report the gain in full in the year of sale because the full purchase price was either actually received by them in the form of financial benefit or, at the least, constructively received by them.

Petitioners, on the other hand, contend that the notes issued by Norris do not constitute payment in the year of sale, citing as authority for this proposition section 453(b)(2). See fn. 12 *supra*. Moreover, petitioners argue that the fact that certificates of deposit were placed in escrow as security for payment of the notes does not prevent the sale from coming within the terms of section 453.

While we agree that petitioners' assertions are, in theory, legally sound, we must carefully examine and evaluate the record herein in search of the facts and circumstances necessary in order to add flesh to petitioners' "bones" of contention. After a thorough review of the entire record, and in particular the testimony [14] adduced at trial, we cannot conclude that the parties to the sale in question intended and agreed that the certificates of deposit were to serve merely as security for payment of the notes issued by Norris. Rather, we infer from the entire record, and hold, that the parties agreed and intended at the time of the sale that the certificates, less interest thereon, constitute the payment for the property sold. Therefore, we accept respondent's alternative argument that the buyers' notes herein served no purpose and were not in reality evidences of indebtedness of the purchasers.

Petitioners and respondent agree that Norris in fact issued promissory notes payable to their order. The notes were in acceptable legal form. However, for tax purposes, conformity to legal forms is not necessarily determinative, *1432 Broadway Corporation*, 4 T.C. 1158 (1945), affirmed per curiam 160 F. 2d 885 (C.A. 2, 1947), for the incidence of taxation depends upon the substance of a transaction. *Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945). We—

may look at actualities and upon determination that the form employed for * * * carrying out the challenged tax event is unreal or a sham [we] may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. * * * [*Higgins* v. *Smith*, 308 U.S. 473, 477 (1940).]

We are in no way bound to recognize as the substance of a transaction a technically elegant arrangement which a lawyer's ingenuity devised. *Griffiths* v. *Commissioner, supra*. See also *Gregory* v. *Helvering*, 293 U.S. 465 (1935); *Everett Pozzi, supra;* and *1432 Broadway Corporation, supra*.

Section 453(b)(2)(A)(ii) limits the application of the installment sale provisions to those situations where payments in the year of sale, exclusive of evidences of indebtedness of the purchaser, do not exceed 30 percent of the selling price.

If Norris had given certificates of deposit directly to petitioners in the year of sale, these certificates would be valued and included as payment in that year.

---

[14] It is noteworthy that none of the individual petitioners testified at trial.

Petitioners would have us believe that the certificates of deposit served solely as security for the payment and discharge of the purchasers' obligations on their notes. They point to the collateral pledge agreement and the escrow agreement as evidence of this fact. However, we feel the true intention of the parties with respect to these certificates is more clearly reflected by what actually transpired.

A representative of the Mercantile National Bank—the escrow holder—testified that usually as each certificate of deposit became due, it was presented for payment to the First National Bank with instructions thereto to issue a check in the principal amount thereof to the order of petitioners while depositing the accrued interest to the Norris accounts at First National. He also testified that as far as he was concerned, the aforementioned procedure was carried out in accordance with the terms of the written escrow agreement set out in our Findings of Fact. This written agreement provided that each matured certificate was to be released and delivered to Norris Dairy and Norris Trust upon receipt by Mercantile National of cash or a bank cashier's check payable either to Choice and the O.B. & O. partners or to Mercantile National in an amount equal to the principal amount of the certificate. In our opinion, the two procedures, i.e., the one outlined in the escrow agreement and the one actually followed by the parties involved as attested to by the testimony adduced at trial, are very different. The only inference we can draw from this testimony is that the representative of Mercantile National was acting upon the belief that he was complying with the true, original intention of the parties to the sale, viz, that the principal amount of each matured certificate of deposit be paid to petitioners and the interest to Norris. Allen Sanders of the First National Bank confirmed in his testimony that this was the original understanding of the parties. Therefore, we are in no way bound by the written escrow agreement nor by all the terms of the agreement to sell dated February 15, 1963, which, in our opinion, do not reflect the parties' true intention.

Petitioners were not looking to the certificates of deposit merely as security in case of default by the buyers on their obligations. They knew and contemplated that as each certificate matured, the principal amount thereof would be paid to them irrespective of whether Norris was in default. We conclude that, in substance, petitioners did not regard Norris as being indebted to them, for the buyers had met their obligation in full when they purchased the certificates of deposit in 1963. Petitioners were not relying upon the Norris notes, but upon the certificates of deposit to serve as payments in connection with the sale.

Moreover, petitioners' rights to the principal amount of the certificates of deposit were not restricted in any meaningful way by the

escrow arrangement. The escrow was mutually agreed upon by petitioners and Norris. Moreover, it was the sellers who insisted that the buyers purchase the certificates. Insofar as the buyers were concerned, they had no preference as to which maturity dates were to be put on the certificates. Thus, the certificates of deposit were available to petitioners in 1963, but they agreed to impose the limitation of time upon their receipt. Under these circumstances, we hold that petitioners received the right to the principal amount of the certificates in 1963. See generally, *Williams* v. *United States, supra; Everett Pozzi, supra; Rhodes* v. *United States,* 243 F. Supp. 894 (W.D. S.C. 1965). Although we have no specific evidence as to the value of this right, we feel it definitely exceeded 30 percent of the face amount of the certificates. Accordingly, we hold that petitioners are not entitled to use the installment sale provisions.

Petitioners argue that the net interest cost to Norris on the sale was much less than it would have paid if the full purchase price had been paid to petitioners on the closing date. The basis for this conclusion, according to petitioners, is that Norris was earning interest on the certificates while not paying interest on the notes it issued to petitioners.

In reply to the foregoing contention, we observe first of all that the Norris notes did not bear interest. This fact could be construed against petitioners in considering whether there was any substance to the issuing of the notes by Norris. Furthermore, we have no evidence as to whether the purchase price would have been reduced in the event that Norris was not to receive the interest on the certificates. It is reasonable to conclude, absent more evidence on this point, that the parties adjusted the total purchase price so as to take account of the fact that the notes were noninterest bearing and that Norris was to receive the interest on the certificates of deposit. Therefore, we accord no particular weight to petitioners' argument nor do we accord much weight to the fact that the notes did not bear interest.

Petitioners rely upon several cases and one revenue ruling to support their position.

The cases cited by petitioners involving the use of escrow arrangements in connection with sales are distinguishable in that the receipt of money from the escrow accounts in those cases was subject to substantial conditions or limitations, other than time. For example, in *Preston R. Bassett,* 33 B.T.A. 182 (1935), part of the sales proceeds was escrowed as a guarantee that the warranties and representations made by the sellers were true and would be faithfully carried out.

Petitioners also rely heavily upon Rev. Rul. 68-246, 1968-1 C.B. 198. There, a taxpayer sold real property and received therefor cash and

notes of the purchaser, bearing interest at the rate of 6 percent per year and payable over a period of 5 years. The buyer secured the notes by executing a deed of trust, and the taxpayer elected to report the gain from the sale on the installment method. Thereafter, in the following year, the buyer, desirous of clearing title to real estate by canceling the deed of trust, agreed with the seller to deposit in escrow an amount of money sufficient to cover the remaining unpaid installments of the note in consideration for the taxpayer's cancellation of the deed of trust. Subsequent note payments were paid out of the escrow account.

This ruling, is, we feel, distinguishable from the instant case in that there was no indication therein that the buyer and seller understood or intended at the time of the sale that the buyer would substitute money for the deed of trust. Moreover, the seller originally intended to look to the obligation of the buyer, and not to the money escrowed by the buyer 1 year after the sale took place. To the contrary, in the instant case, it was understood and intended by the parties at the time of the sale that the sellers would look to the escrowed certificates for payment as each became due. There is no sound reason for disturbing a transaction which was intended to and did in fact fit within the purview of section 453. However, here we have a transaction which, although in form was designed to meet the requirements of section 453, did not in substance qualify thereunder. See *Everett Pozzi, supra.*

We also find distinguishable *R. L. Brown Coal & Coke Co.*, 14 B.T.A. 609 (1928), which was cited by petitioners for the proposition that a buyer's notes secured by certain "certificates of interest" issued by a State bank do not stand upon any different plane from other notes to the purchaser which were secured by the property sold. In that case there was no evidence that the seller was looking to the "certificates of interest" as more than mere security for the discharge of the buyer's obligation.

Our conclusion on this issue is based on the facts and circumstances of this case. We are not saying that if a selling taxpayer actually carries through an installment sale transaction, he would be prevented from so reporting it even though the payments were made in installments at his insistence. *Everett Pozzi, supra.*

In view of the foregoing, we need not reach the question whether the Norris interests were ready, willing, and able to pay the entire proceeds of sale to petitioners in 1963, thereby making the sales price available to them in that year.

To reflect the conclusions reached herein,

*Decisions will be entered for the respondent.*