ULYSSES G. TRIVETT, JR., AND VIOLET W. TRIVETT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Trivett v. Commissioner
Docket No. 2113-75.
United States Tax Court
T.C. Memo 1977-161; 1977 Tax Ct. Memo LEXIS 275; 36 T.C.M. (CCH) 675; T.C.M. (RIA) 770161; May 31, 1977, Filed William I. Althen and George D. Webster, for the petitioners. Robert B. Nadler, for the respondent. DAWSON
MEMORANDUM OPINION DAWSON, Chief Judge: Respondent determined a deficiency of $95,600.56 in petitioners' Federal income tax for the year 1969. Several adjustments *276 have been conceded by the parties. The issues remaining for our decision are (1) whether petitioners are entitled to report the proceeds from the sale of a Dairy Queen franchise on the installment method; (2) whether petitioners are entitled to a loss of $25,164 from the Garden-Vale Apartments, a partnership; and (3) whether petitioners are entitled to a deduction of $45,624 under section 162 or 163 in excess of the amount allowed by respondent. All of the facts have been stipulated by the parties. We adopt the stipulation of facts and the exhibits attached thereto as our findings. The pertinent facts are summarized below. The legal residence of Ulysses G. Trivett, Jr. and Violet W. Trivett was in Johnson City, Tennessee, on the date their petition was filed in this case. They filed a joint Federal income tax return for the taxable year 1969 with the Director, Southeast Service Center, Chamblee, Georgia. Violet W. Trivett is a party to these proceedings solely by virtue of having signed and filed with Ulysses G. Trivett, Jr., her husband, the joint Federal income tax return in controversy. For the taxable year 1969, Ulysses G. Trivett, Jr. (hereinafter referred to as petitioner) *277 reported income for Federal income tax purposes on the cash receipts and disbursements method of accounting. On April 18, 1969, American Dairy Queen Corporation (hereinafter referred to as ADQ) offered to purchase, for $370,000, a Dairy Queen franchise owned by petitioner. The franchise, covering a geographical area in Eastern Tennessee, included the right to sell ADQ products to various retail store operators. On May 6, 1969, petitioner gave ADQ an option to purchase his Dairy Queen franchise for $400,000. ADQ notified petitioner on June 5, 1969, that it intended to exercise the option to purchase the franchise. On June 19, 1969, petitioner and ADQ entered into an Agreement which provided for the sale of petitioner's Dairy Queen franchise to ADQ for a total consideration of $400,000. The Agreement provided as follows: This agreement made and entered into by and between U.G. Trivett, Jr., hereinafter referred to as the Seller, and American Dairy Queen Corporation, hereinafter referred to as the Purchaser, AND, Whereas, the parties have been negotiating for the Sale and Purchase of the Dairy Queen Franchise and other properties owned by the Seller, and at the initial meeting *278 and other meetings since, the Seller has made it known that he could not afford to sell for the price offered unless the sale could be on an Installment basis and whereas, the Purchaser has been from the beginning acquainted with this fact, and agreed to such arrangement. Now, therefore, the Seller hereby sells and the Purchaser hereby purchases the following described property according to an itemized list attached hereto marked Exhibit "A" and made a part hereof for a total consideration of Four Hundred Thousand ($400,000.00) Dollars payable as follows: One Hundred Thousand ($100,000.00) Dollars Cash and the balance payable One Hundred Thousand ($100,000.00) Dollars in one (1) year, One Hundred Thousand ($100,000.00) Dollars in two (2) years and One Hundred Thousand ($100,000.00) Dollars in three (3) years from date, evidenced by notes due and payable in one (1), two (2) and three (3) years from date. The Seller agrees to waive retention of Title to the personal property or mortgage Liens upon condition that the Purchaser secure the deferred payment notes in such manner to guarantee payment when due.
It is further understood and agreed by the parties to this Instrument that *279 under no theory of law, nor in any way, or by any means shall the Seller, U.G. Trivett, Jr. have the right to get, obtain or receive any part of [sic] portion of the sales price of said property, except under the plan of installment sale set out above, and the Purchaser shall have no right under any theory of law to pay any portion or part of said purchase price other than by the Installment sales plan set out above. In order to guarantee the payment of said purchase money notes when due, the Purchaser will purchase in the name of the Seller legal certificates of Deposit from the Citizen Bank in sufficient amount to secure the payment of said notes as they fall due and place in the Trust Department of said Bank marked and identified as security for said notes with the understanding said Bank will cash said Certificates and pay the amount of said notes as they fall due. * * *
Although ADQ was ready, willing and able to pay the full sales price of $400,000 on June 19, 1969, petitioner suggested an alternative method of payment. The manner of payment finally agreed upon was proposed by petitioner and accepted by ADQ during June 1969. The sale of petitioner's Dairy Queen *280 franchise to ADQ was carried out as follows: ADQ paid petitioner $100,000 in cash on June 19, 1969. On June 20, 1969, ADQ signed three promissory notes, each note payable to petitioner in the amount of $100,000. As part of that same transaction, ADQ, on June 20, 1969, purchased in its name three $100,000 certificates of deposit bearing interest at 6.25 percent. The certificates of deposit were purchased at the Citizens Bank of Elizabethton, Tennessee. [1]
On June 20, 1969, Herman E. Nelson of ADQ endorsed Certificates No. 862, 863, and 864 as follows: No. 862-Pay to the Order of U.G. Trivett, Jr., on June 20, 1970, American Dairy Queen Corporation by Herman E. Nelson. No. 863-Pay to the Order of U.G. Trivett, Jr., on June 20, 1971, American Dairy Queen Corporation by Herman E. Nelson. No. 864-Pay to the Order of U.G. Trivett, Jr., on June 20, 1972, American Dairy Queen Corporation by Herman E. Nelson. The parties to the sale intended and agreed that the certificates of deposit were to constitute full consideration of ADQ's obligation. Interest on the certificates *281 of deposit was paid to petitioner. On June 20, 1970, the Citizens Bank of Elizabethton, Tennessee, paid three checks, each in the amount of $6,250 to petitioner as interest on Certificates No. 862, 863, and 864. On that date, Certificate No. 862 was also paid to petitioner.For the period June 20, 1970, to June 20, 1971, petitioner and/or his representative agreed with the Citizens Bank of Elizabethton that the certificates of deposit should bear a market rate of interest which for the period was determined to be 7.25 percent. On June 30, 1969, petitioner and Glenn F. Nicely (hereinafter referred to as Nicely) entered into a Partnership to construct and rent low and moderate income housing. The Partnership, known as Garden-Vale Apartments, was owned equally by petitioner and Nicely. On September 24, 1969, Garden-Vale Apartments entered into an Agreement with Schumacher Mortgage Company (hereinafter referred to as Schumacher) to borrow $772,500 to construct the apartment project. On October 6, 1969, Schumacher transferred to Tennessee Title Company (hereinafter referred to as Tennessee Title) the amount of $92,058 from the first draw of the mortgage proceeds. Tennessee Title *282 disbursed the amount of $92,058 on or about October 6, 1969, for the following purposes: Carrying and Finance Charges
$42,819.63
Legal and Organizational Fees
4,000.00
Architect
23,700.00
Land
21,538.37
$92,058.00
The amount of $42,819.63 charged to "carrying and finance charges" on October 6, 1969, was disbursed by Tennessee Title as follows: FHA Mortgage Insurance Premium
$ 3,863.00
Initial Service Fee
15,450.00
Title and Recording
4,000.00
FHA Inspection Fee
3,863.00
FHA Application Fee and
Commitment Fee
2,318.00
Federal National Mortgage
Association Fee (FNMA)
13,325.63
$42,819.63
tennessee Title paid the FHA examination fee ($2,318) and the FNMA fee ($13,325.63) to petitioner from funds previously advanced for these two purposes. Garden-Vale Apartments claimed deductions on its 1969 Partnership return of income of $46,795 for interest expenses, $2,500 for legal fees, $150 for amortization of its organizational costs and $700 for state taxes. The $2,500 itemized as legal fees on the partnership return consisted of payment for the services of Kenneth Cole who is not an attorney but who provided consultant services *283 for the project. The disbursement of $4,000 on October 6, 1969, for "title and recording" included the $700 for transfer taxes. On petitioner's joint Federal income tax return for the taxable year ended December 31, 1969, he claimed a loss of $25,164 from the Garden-Vale Apartments. In the statutory notice of deficiency sent to petitioner on December 13, 1974, respondent disallowed $24,448.90 of the claimed partnership loss. On November 3, 1969, petitioner entered into an Agreement with Schumacher to borrow $1,094,500 to construct the Clark Manor Apartments. On that same date, Schumacher transferred to William R. Fain, III, (hereinafter referred to as Fain) the amount of $105,732 from the first draw of the mortgage proceeds. Fain disbursed the $105,732 on or about November 3, 1969, for the following purposes: Carrying and Finance Charges
$36,747.00
Legal and Organization Fees
5,000.00
Architect
34,785.00
Miscellaneous
7,379.00
Land
21,821.00
$105,732.00
The amount of $36,747 charged to "carrying and finance charges" on November 3, 1969, was disbursed by Fain as follows: FHA Application Fee
$ 3,284.00
Initial Service Fee
21,890.00
Title and Recording
6,100.00
FHA Inspection Fee
$ 5,473.00
$36,747.00
*284 On petitioner's 1969 joint Federal income tax return, he claimed $65,514 as an interest deduction related to the Clark Manor Apartments. In the statutory notice of deficiency mailed to petitioner on December 13, 1974, respondent disallowed $45,624 of the claimed interest deduction. Issue 1. Sale of Dairy Queen Franchise.
On June 19, 1969, petitioner entered into an Agreement with ADQ to sell his Dairy Queen franchise to ADQ for a total consideration of $400,000. Pursuant to the terms of the Agreement, ADQ paid petitioner $100,000 in cash and signed three promissory notes, each in the amount of $100,000, payable to petitioner on June 20, 1970, June 20, 1971, and June 20, 1972, respectively. The Agreement also provided that ADQ would purchase certificates of deposit in an amount sufficient to secure payment of the promissory notes as they matured. ADQ purchased three certificates of deposit, each in the amount of $100,000, with maturity dates identical to those of the promissory notes. On June 20, 1969, these certificates were endorsed by a representative of ADQ to the order of petitioner. The certificates were held by the Citizens Bank of Elizabethton, Tennessee until *285 maturity, at which point they were paid to petitioner. Petitioner reported the sale of his Dairy Queen franchise as an installment sale under section 453. [2] Respondent, however, determined that petitioner was not entitled to report the sale on the installment method. The installment method of reporting sales income under section 453 permits a seller of certain types of property to elect to spread the reporting of profit from an installment sale over the period during which he will receive payments. The object of that section is to allow the seller to pay his tax liability as he receives payments from the buyer, rather than force him to pay his taxes prior to actual collection of the sales price. The statutory provisions authorizing the use of the installment method are relief provisions and are exceptions to the general rule as to the year for reporting income. As a result, they must be strictly construed. Cappel House Furnishing Co. v. United States,244 F. 525, 529 (6th Cir. 1957); *286 Pozzi v. Commissioner,49 T.C. 119, 127 (1967). Section 453(b) involves sales of realty and casual sales of personalty. Installment sale treatment of sales of realty and casual sales of personalty is restricted by the limitation provided in section 453(b)(2). [3] That section provides that if "payments," exclusive of evidences of indebtedness of the purchaser, received in the year of sale exceed 30 percent of the selling price, installment sale treatment is unavailable. It is respondent's position that petitioner received "payments" in excess of 30 percent of the sales price in *287 the taxable year of sale and is not entitled to report the proceeds from the sale on the installment basis. He makes two arguments in support of his position. First, he argues that because ADQ was ready, willing and able to pay the full sales price on June 19, 1969, and since the entire proceeds were available to petitioner on that date, petitioner either actually or constructively received the full sales price in the year of sale. Alternatively, respondent argues that the promissory notes were a sham and that the certificates of deposit were not intended as security for the notes but were, in reality, "payments" for the franchise. Petitioner, to the contrary, contends that the Agreement of June 19, 1969, evidences his intention to sell the franchise on the installment method, and maintains that the certificates of deposit were not "payments" for the franchise but were merely security for the promissory notes (evidences of indebtedness) paid to petitioner as part of the purchase price. We agree with respondent's alternative argument. The promissory notes herein served no purpose and were not, in reality, evidences of indebtedness of the purchaser. The certificates of deposit *288 were not merely security for the notes signed by ADQ. The certificates themselves constituted "payment" for the franchise sold by petitioner to ADQ. Respondent and petitioner agree that to qualify for installment sale treatment the transaction must be a qualifying installment sale in both form and substance. We must examine the substance of the transaction to determine whether it qualifies as a valid installment sale. "A transaction purporting to be a sale on the installment basis that lacks reality will be no more effective in avoiding taxes than any other type of sale." Pozzi v. Commissioner,supra at 127. We think that the substance of this transaction was other than its form. While the Agreement of June 19, 1969, purports to create a security arrangement to ensure payment of the promissory notes, the notes served no purpose and the security arrangement was a sham. ADQ met its obligation in full on June 20, 1969, when it paid petitioner $100,000 in cash and endorsed the certificates of deposit to petitioner with the only restriction on their delivery being *289 that one of the certificates would be delivered on June 20, 1970, one on June 20, 1971, and one on June 20, 1972. After June 20, 1969, ADQ had no interest in or control over the certificates and no further involvement in the transaction. The parties to the sale intended and agreed that the certificates were to constitute full consideration for ADQ's obligations. When ADQ endorsed the certificates of deposit to the order of petitioner on June 20, 1969, ADQ's legal obligations on the notes were extinguished. At that time petitioner merely had to wait for the notes to mature, at which point the proceeds of the certificates would be paid to petitioner in accordance with the special endorsement. ADQ was divorced from the transaction as of June 20, 1969. Petitioner did not believe that ADQ was indebted to him in the amount of $300,000. We think the parties to the Agreement intended for the certificates of deposit to be treated as the consideration for the franchise. The certificates were not merely security for the notes, to be utilized only if ADQ defaulted on its note obligations. The principal amount of each certificate of deposit was to be paid to petitioner upon maturity, *290 regardless of the financial condition of ADQ. Petitioner would have received the proceeds of the matured certificates even if ADQ was in default. We think it is clear that petitioner was not relying on the promissory notes, but upon the certificates of deposit to serve as payment for the franchise. The promissory notes were a nullity, not valid evidences of indebtedness. Petitioner received "payments" in the form of certificates of deposit in excess of 30 percent of the selling price in the taxable year of sale. Consequently, he is not entitled to report the sale on the installment method. The facts of this case are virtually indistinguishable from the facts in Oden v. Commissioner,56 T.C. 569 (1971). The taxpayers in Oden agreed to sell certain real and personal property in 1963 to Norris Dairy Products Co., Inc. and to the Norris Dairy Products Co. Employees' Profit Sharing Trust (Norris or buyer) for a total consideration of $364,457. On the closing date, Norris made a down payment of $23,000 and executed promissory notes for the balance, one note payable in three annual installments and the other payable in five annual installments. The formal agreement *291 to sell provided that the promissory notes would be secured by certificates of deposit, each certificate having a principal amount and maturity date corresponding to the principal amount and maturity date of each installment of the notes. Interest on the certificates of deposit was paid to Norris, the buyer. The certificates were placed in an escrow account at Mercantile National Bank in Dallas, Texas (the escrow bank). The escrow agreement, dated March 19, 1963, provided that the buyer would issue a check to the escrow bank as each installment matured, and the bank would then forward a cashier's check to the taxpayers (sellers) and release the matured certificate of deposit to the buyer. This procedure was not followed. In actuality, the normal practice was for the escrow bank simply to pay the installment note directly to the taxpayers (sellers) with the proceeds from the matured certificate of deposit, without regard to whether or not Norris was in default on the notes. The Commissioner determined that the taxpayers were not entitled to report the sale on the installment method under section 453, relying on the same grounds he relies upon in the instant case--the theory *292 of constructive receipt and the theory that the promissory notes served no purpose and were a nullity. In Oden we chose to rely primarily on respondent's second theory and held that the certificates of deposit were not intended merely as security for the notes, but were intended as payment for the property. In stating the reasons for our holding, we said (56 T.C. at 576): Petitioners were not looking to the certificates of deposit merely as security in case of default by the buyers on their obligations. They knew and contemplated that as each certificate matured, the principal amount thereof would be paid to them irrespective of whether Norris was in default. We conclude that, in substance, petitioners did not regard Norris as being indebted to them, for the buyers had met their obligation in full when they purchased the certificates of deposit in 1963. Petitioners were not relying upon the Norris notes, but upon the certificates of deposit to serve as payments in connection with the sale. Except for the absence of an escrow agreement in the instant case, the facts in Oden are nearly identical to the facts herein. Because the terms of the written escrow *293 agreement were not followed in Oden, the procedure actually followed was identical to the procedure followed in this case. In both cases the promissory notes were ignored, and the bank paid the proceeds of the matured certificates of deposit directly to the sellers. There is no substantive difference between the facts of this case and those in Oden. In both cases the promissory notes were nothing more than pieces of paper without legal significance. As in Oden, we agree with respondent's argument that the buyers' notes were not, in reality, evidences of indebtedness and hold that the parties agreed and intended that the certificates of deposit were to constitute payment for the property sold. Having decided that the promissory notes were not valid evidences of indebtedness and that the certificates of deposit constituted "payments" in the year of sale, causing petitioner to exceed the 30 percent limitation of section 453(b)(2), we need not consider respondent's argument based on the theory of constructive receipt. Issue 2. Garden-Vale Apartments.
On July 30, 1969, petitioner and Glenn F. Nicely entered into a partnership to construct and rent low and moderate *294 income housing. The partnership, known as Garden-Vale Apartments, was owned equally by petitioner and Nicely. On September 24, 1969, Garden-Vale Apartments entered into an agreement with Schumacher Mortgage Company to borrow $772,500 to construct the apartment project. On October 6, 1969, Schumacher transferred to Tennessee Title Company the amount of $92,058 from the first draw of the mortgage proceeds. On or about October 6, 1969, Tennessee Title disbursed the $92,058. The amount of $42,819.63 charged to "carrying and finance charges" was disbursed by Tennessee Title as follows: FHA Mortgage Insurance Premium
$ 3,863.00
Initial Service Fee
15,450.00
Title and Recording
4,000.00
FHA Inspection Fee
3,863.00
FHA Application Fee and
Commitment Fee
2,318.00
Federal National Mortgage
Association Fee (FNMA)
13,325.63
$42,819.63
Garden-Vale Apartments claimed a deduction on its 1969 partnership return of income for interest expenses of $46,795. On petitioner's joint Federal income tax return for the taxable year 1969, he claimed a loss of $25,164 from the Garden-Vale Apartments. Respondent disallowed $24,448.90 of the claimed loss in his notice of *295 deficiency. Respondent has conceded that the partnership is entitled to an interest deduction of $13,325.63 for the Federal National Mortgage Association fee. Still at issue are the deductions taken by petitioner for the FHA mortgage insurance premium, the initial service fee, title and recording, the FHA inspection fee and the FHA application fee and commitment fee. Petitioner contends that the fees in issue are deductible as interest pursuant to section 163, or as ordinary and necessary business expenses under section 162. Respondent, on the other hand, contends that the fees were paid for the performance of services rendered in obtaining financing and are not deductible under either section 162 or 163.
Section 163(a) provides that "[there] shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." Interest has been defined as "the amount which one has contracted to pay for the use of borrowed money." Old Colony R. Co. v. Commissioner,284 U.S. 552, 560 (1932). Petitioner argues that each of the deducted fees and *296 premiums was required by the FHA in order for him to obtain a loan, and thus they constitute hidden interest charges. He contends that the Garden-Vale Apartments project was a low income housing project which required approval from the Department of Housing and Urban Development in order to obtain mortgage insurance. In addition, Schumacher Mortgage Company, the mortgagee, required petitioner to obtain FHA mortgage insurance before it would consummate the mortgage loan transaction. Thus, petitioner contends that the expenditures required by HUD were a part of the cost of the loan from Schumacher, and therefore are deductible as interest. Petitioner cites authority for the proposition that fees paid to obtain a loan are considered additional amounts paid for the use of money and thus are deductible as interest in the year of payment. See Rev. Rul. 69-290, 1969-1 C.B. 55, Rev. Rul. 69-188, 1969-1 C.B. 54. The burden of proof is on petitioner to show that the fees in issue were an *297 additional cost of borrowed money as opposed to a charge for services rendered in obtaining the loan. Welch v. Helvering,290 U.S. 111 (1933); Rule 142, Tax Court Rules of Practice and Procedure.
The evidence is unclear as to what services were actually rendered in return for the fees paid by petitioner. The evidence indicates, however, that the fees were used for such things as reimbursing the mortgagee's closing costs, issuance of a site appraisal and market analysis, insurance, and services rendered in making a title search and recording title to the property. Petitioner has not presented any persuasive evidence that the fees were an additional cost of borrowed money. We think they are more like payments for services rendered in obtaining permanent financing for the project. Accordingly, we hold that the fees are not deductible as interest. In the alternative, petitioner contends that the fees are deductible as ordinary and necessary business expenses under section 162. He argues that he was in the business of building apartments. The payments, he says, were ordinary expenses as opposed to capital expenditures. He asserts that the payments did not *298 purchase any capital assets, but enabled him to improve his cash flow position by participating in the insurance program provided by the National Housing Act. Thus he maintains that the costs he incurred in meeting FHA requirements constituted deductible business expenses. We disagree with petitioner.We think the fees in issue constitute compensation for services rendered in obtaining the loan. They are capital expenditures, and should be capitalized over the life of the loan. In Lovejoy v. Commissioner,18 B.T.A. 1179 (1930) involving similar fees, we said at page 1182: In its essence such a disbursement is not unlike bond discount, prepaid rent, cost of acquiring or disposing of a leasehold or term contract and many other transactions. They should be spread over the definite period of the loan, lease or contract. Accordingly, we conclude that the fees are not deductible under section 162; and the petitioner is not entitled to the claimed loss of $25,164 from the Garden-Vale Apartments. Issue 3. Clark Manor Apartments.
On November 3, 1969, petitioner entered into an Agreement with Schumacher to borrow $1,094,500 to construct the Clark Manor Apartments. *299 On November 3, 1969, Schumacher transferred to William R. Fain the amount of $105,732 from the first draw of the mortgage proceeds.On or about November 3, 1969, Fain disbursed the $105,732.The amount of $36,747 charged to "carrying and finance charges" was disbursed as follows: FHA Application Fee
$ 3,284.00
Initial Service Fee
21,890.00
Title and Recording
6,100.00
FHA Inspection Fee
5,473.00
$36,747.00
On petitioner's joint Federal income tax return for the taxable year 1969, he claimed $65,514 as interest related to the Clark Manor Apartments. Respondent disallowed $45,624 of the claimed interest deduction in his notice of deficiency. He has conceded an additional amount of $10,945. At issue are the deductions taken by petitioner for the FHA application fee, the initial service fee, title and recording, and the FHA inspection fee. Petitioner contends that such fees are deductible as interest under section 163, or as ordinary and necessary business expenses under section 162. Respondent contends that the fees were paid for the performance of services rendered in obtaining financing and are not deductible under either section 162 or 163. For *300 the reasons stated with respect to Issue 2, we hold that such fees paid by petitioner in connection with the Clark Manor Apartments are not deductible under section 162 or section 163. Petitioner has not shown that he is entitled to an interest deduction in excess of the total amount allowed and agreed to by the respondent. Decision will be entered under Rule 155. Footnotes
1. A certificate of deposit is a negotiable instrument which is set up to mature on a specific date.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years involved, unless otherwise indicated.↩
3. Section 453(b)(2) provides: (2) LIMITATION.-Paragraph (1) shall apply-- (A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition-- (i) there are no payments, or (ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 per cent of the selling price. * * *↩