*Decisions will be entered under Rule 155.*

H. N. WATSON, JR., AND WIFE, SHIRLEY WATSON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4239–76.     Filed January 5, 1978.

*J. R. Blumrosen,* for the petitioners.
*Charles R. Billings,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency in the amount of $23,319.41 in petitioners' Federal income tax for 1973. A concession on another issue having been made by petitioners, the sole issue remaining for decision is whether petitioners realized income of $42,146.51 in 1973 from the sale of 147 bales of cotton under terms pursuant to which they received an irrevocable letter of credit from a local bank in that year.

### FINDINGS OF FACT

Petitioners H. N. Watson, Jr., and Shirley Watson, husband and wife, were legal residents of Ralls, Tex., when they filed

their petition. They filed a joint Federal income tax return for 1973 employing the cash receipts and disbursements method of accounting. Hereinafter H. N. Watson, Jr., also known as Sonny Watson, will be referred to as petitioner.

During 1973 and prior years, petitioner was engaged in farming in the vicinity of Ralls, Tex. One of his principal crops was cotton. In a normal year, petitioner would plant his cotton crop in late May or early June and harvest it in October or November. Due to adverse weather conditions in the fall of 1972, he was unable to harvest part of his 1972 cotton crop until early 1973. During the fall of 1973, weather conditions were normal, and he harvested his 1973 cotton crop in October and November of that year.

Many other farmers in west Texas were faced with the prospect of reporting most of their income from two crops in 1 year as a result of their inability, due to weather conditions, to harvest and sell their 1972 cotton crops until the early part of 1973. Correctly anticipating that many of these farmers would wish to defer receipt of the sales proceeds from their crops in order to avoid the bunching of their 1972 and 1973 cotton crop income in 1 year, Gene McLaughlin, president of Security State Bank & Trust Co. (Security Bank or the bank), Ralls, Tex., had the bank's attorney draw up documents for what he called the deferred payment package. The package included a deferred payment agreement, a deferred payment authorization, a banker's letter of credit, and a disclaimer form. The bank made this package available to gins, includings Cone Gin, Inc. (Cone Gin), and grain elevators which did business with Security Bank as borrowers or depositors.

Cone Gin purchased and resold cotton for its own account. After ginning his cotton, a farmer would offer it for sale, and a Cone Gin official would telephone the seven or eight cotton merchants with whom Cone Gin dealt to determine the highest available price. On the basis of quotations from those merchants, Cone Gin would quote to the farmer a price which would give Cone Gin a profit of about $1 per bale. On closing a purchase, Cone Gin would write a check on its own account and would then immediately resell the cotton to the merchant who had offered the highest price. Only on rare occasions did Cone Gin hold cotton and speculate that its price would rise. If the price rose after the merchants' quotations were received but prior to

closing a purchase from the farmer, Cone Gin would pass the increase on to the farmer. If the price changed after the purchase from the farmer and prior to Cone Gin's resale, Cone Gin absorbed the gain or loss.

On November 1, 1973, petitioner, designated as "Producer," and Cone Gin, designated as "Purchaser," entered into a Deferred Payment Agreement which provided in part:

(2) THAT the undersigned Producer agrees that payment for any farm product to be delivered to the undersigned Purchaser shall be deferred and that no payment of any kind will be made by Purchaser and that Purchaser shall not be liable upon demand for such payment at any time prior to the first day of the calendar year following delivery of such farm products to Purchaser;

(3) THAT in consideration of the foregoing deferment, the undersigned Purchaser agrees to execute a "DEFERRED PAYMENT AUTHORIZATION" upon demand by Producer following delivery under a contract of sale and purchase between Producer and Purchaser, or under open, market conditions, such as Authorization being for the amount owing Producer at that time, payable only to such Producer, being neither negotiable, assignable, nor transferable, and in no event being due prior to the first day of the calendar year following delivery of such farm products to said Purchaser;

(4) THAT in further consideration of the foregoing deferment, and as security for the payment of sums that Purchaser shall owe Producer as a result of the delivery of farm products, Purchaser agrees to furnish to Producer a "BANKER'S LETTER OF CREDIT", issued by Security State Bank & Trust Co., Ralls, Texas, in the amount of any such Deferred Payment Authorization. Such Letter of Credit shall be furnished to Producer within —( ) days following execution of the Deferred Payment Authorization and shall guarantee honor of said Deferred Payment Authorization, pursuant to the terms thereof; and,

(5) THAT failure to furnish the "DEFERRED PAYMENT AUTHORIZA-TION" and "BANKER'S LETTER OF CREDIT" by the undersigned Purchaser in the manner and within the time as hereinabove set out shall constitute BREACH of this contract between the parties hereto and Producer may recover all farm products delivered to Purchaser pursuant to this agreement.

On or about November 29, 1973, petitioner sold and delivered 147 bales of cotton to Cone Gin for a net purchase price of $42,146.51. The delivery of the cotton was evidenced by the transfer to Cone Gin of the warehouse receipt and Government classing card petitioner had received for each bale when it was ginned and stored in a warehouse. Invoice No. 4923 covering the 147 bales of cotton sold to Cone Gin reflected that petitioner was the seller.

In consideration of the sale, Cone Gin, as purchaser, issued to

Security Bank a Deferred Payment Authorization which was endorsed by petitioner as follows:

To:  Security State Bank & Trust Co.
     Post Office Drawer AA
     Ralls, Texas 79357

### DEFERRED PAYMENT AUTHORIZATION

$42,146.51                                    November 30 A.D. 1973

This authorization is neither negotiable, assignable, nor transferable, and is issued for the benefit of the below named Producer only.

Upon due presentment and indorsement of this authorization, you are authorized and directed to pay to

Sonny Watson    ONLY,

the sum of Forty two thousand one hundred forty six and 51/100 — Dollars, on, BUT NOT BEFORE, the 10 day of January A.D. 1974

Such sum so authorized represents the debts owing by the undersigned Purchaser to the above named Producer as a result of the delivery of certain farm products by said Producer to the undersigned Purchaser.

EXECUTED this 30 day of November A.D. 1973

On the same date, Security Bank executed an Irrevocable Banker's Letter of Credit to petitioner in the amount of $42,146.51, which was delivered to petitioner, as follows:

### SECURITY STATE BANK & TRUST CO.

Ralls, Texas

To:  Sonny Watson                         Date:  November 30, 1973
     Box 296
     Ralls, Texas

Amount of Credit:  $42,146.51

This is an IRREVOCABLE BANKER'S LETTER OF CREDIT whereby the Security State Bank & Trust Co., Ralls, Texas, acknowledges that

Cone Gin, Inc.

has established with said Bank a line of credit sufficient to cover the principal amount to become due under a certain DEFERRED PAYMENT AUTHORI-ZATION, dated the 30 day of November, 1973, executed by the said

Cone Gin, Inc.

authorizing and directing payment to the addressee herein, on, BUT NOT

BEFORE, the 10 day of January, 1974, of the sum of <u>Forty two thousand one hundred forty six and 51/100</u>—DOLLARS.

Security State Bank & Trust Co., Ralls, Texas, hereby CERTIFIES and GUARANTEES acceptance and honor of the above described <u>DEFERRED PAYMENT AUTHORIZATION</u> upon due presentment and indorsement by addressee herein, on, but not before, the stated date.

SECURITY STATE BANK & TRUST CO.
Post Office Drawer AA
Ralls, Texas 79357

On November 30, 1973, petitioner signed another document in which he acknowledged that neither Security Bank nor Cone Gin had guaranteed or represented that any particular income tax consequences would arise from the use of the Deferred Payment Agreement, the Deferred Payment Authorization, and the Irrevocable Banker's Letter of Credit executed and issued in connection with the purchase and sale of farm products for which payment was deferred.

Cone Gin immediately resold the 147 bales of cotton it purchased from petitioner. On November 30, 1973, a cashier's check in the amount of $42,146.51 was issued by Security Bank listing Cone Gin as the "Purchaser" and Security Bank as the "Payee." The cashier's check, a bank asset, was reflected on its books and records as a counterbalance to its liability under the letter of credit to pay petitioner for his cotton after January 10, 1974. The bank retained the funds representing the proceeds of the sale of the cotton from the date of the sale to the date of the payment of its obligation to petitioner. Petitioner did not know any of the details of the dealings between Cone Gin and Security Bank in respect of the processing of the cashier's check.

Complying with the directions given to him by Cone Gin's general manager, petitioner, on January 10, 1974, went to Security Bank, surrendered his banker's letter of credit, and received a check for $42,146.51 in payment for his cotton. He reported the $42,146.51 as income on the joint income tax return petitioners filed for 1974. In the notice of deficiency respondent determined that the $42,146.51 was taxable in 1973.

OPINION

Section 1001(a)[1] provides that the gain from the sale of

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.

property shall be the excess of the amount realized therefrom over the property's adjusted basis. Section 1001(b) provides that the amount realized shall be the sum of any money received plus "the fair market value of the property (other than money) received." Section 1002 states that: "Except as otherwise provided in this subtitle, * * * the entire amount of the gain or loss, determined under section 1001, shall be recognized."

For cash basis taxpayers, such as petitioner, this section 1002 exception brings into play section 451(a) which provides that the "amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer." Under the accompanying section 1.451–1(a), Income Tax Regs., a cash basis taxpayer shall include in gross income amounts "when actually or constructively received."

We hold that the Irrevocable Banker's Letter of Credit received by petitioner was "property" which had "fair market value" within the meaning of section 1001(b). The letter of credit was the type of instrument used in commerce, and it was readily convertible to cash. As argued by respondent, the letter of credit was equivalent to cash. Accordingly, petitioner realized and recognized taxable income of $42,146.51 on receipt of the letter of credit in 1973.

The November 1, 1973, Deferred Payment Agreement specified in advance the steps to be taken in the sale of petitioner's cotton. Under that agreement, petitioner sold his cotton to Cone Gin on November 29, 1973; Cone Gin paid full consideration for

---

Sec. 1001 provides in part as follows:

SEC 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS.

(a) COMPUTATION OF GAIN OR LOSS.—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

(b) AMOUNT REALIZED.—The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. In determining the amount realized—

(1) there shall not be taken into account any amount received as reimbursement for real property taxes which are treated under section 164(d) as imposed on the purchaser, and

(2) there shall be taken into account amounts representing real property taxes which are treated under section 164(d) as imposed on the taxpayer if such taxes are to be paid by the purchaser.

(c) RECOGNITION OF GAIN OR LOSS.—In the case of a sale or exchange of property, the extent to which the gain or loss determined under this section shall be recognized for purposes of this subtitle shall be determined under section 1002.

the cotton to Security Bank; and the bank issued to petitioner its Irrevocable Banker's Letter of Credit. At the completion of this series of transactions, petitioner's sale of his cotton was no longer an executory contract. It was a completed transaction. As contemplated from the outset, petitioner received the letter of credit which entitled him to be paid by the bank.

A banker's letter of credit is a convenient device used in commerce to meet credit needs in purchase-sale transactions. *Barclays Bank D.C.O. v. Mercantile National Bank*, 481 F.2d 1224, 1231–1232 (5th Cir. 1973); *Sisalcords Do Brazil, Ltd. v. Fiacao Brasileira De Sisal, S.A.*, 450 F.2d 419, 421 (5th Cir. 1971). The device is used primarily in international transactions and in domestic transactions where a purchaser and seller operate in different markets.[2] Ordinarily, it is not used in local transactions but was used here as part of Security Bank's deferred payment package. The legal consequences of petitioner's receipt of the letter is governed by Texas law.

The banker's letter of credit[3] issued to petitioner was a tripartite agreement. The gin, buyer of petitioner's cotton, requested the bank to issue the letter of credit and transferred the full amount of the cotton's purchase price to the bank before the credit was issued. The bank issued the letter and thereby obligated itself to pay the $42,146.51 to petitioner on presentment of the Deferred Payment Authorization. In accord with the November 1, 1973, Deferred Payment Agreement, petitioner became the beneficiary of the letter of credit and upon its receipt became entitled to draw or demand from the bank the payment in the specified amount.

Under the Texas statute, which is similar to the Uniform Commercial Code, a credit is established as to a beneficiary, such as petitioner, when he receives the letter or authorized written

---

[2]B. Auerbach, "Letters of Credit—A Concise Codification," 23 Ohio St. L. J. 248 (1962), states:

"It has been estimated that about ninety percent of the financing of international sales is done by means of letters of credit. In domestic trade, its use is also increasing substantially. [Fn. ref. omitted.]"

[3]Tex. Code Bus. & Com. Ann. sec. 5.103(a)(1) (1968), defines letters of credit as follows:

"'Credit' or 'letter of credit' means an engagement by a bank or other person made at the request of a customer and of a kind within the scope of this chapter (Section 5.102) that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit. A credit may be either revocable or irrevocable. The engagement may be either an agreement to honor or a statement that the bank or other person is authorized to honor."

advice of its issuance. The clear inference from the record is that petitioner received this letter from the bank shortly after November 30, 1973, when he sold his cotton. Since the letter issued to petitioner was irrevocable, it could have been modified or revoked only with his consent.[4] Thus, petitioner's rights as beneficiary of the letter of credit against the bank for payment of a sum equal to the purchase price of the cotton were fixed upon his receipt of the letter of credit in 1973.

Since Cone Gin had already taken title to, and received delivery of, the cotton, it no longer had any interest in the date on which petitioner was paid. Security Bank had received the purchase price of the cotton from Cone Gin and, therefore, had no legitimate concern as to whether it paid petitioner or someone else the proceeds of the letter of credit. Consistent with these realities, the Texas statute provides that, even though the letter of credit states it is nontransferable or nonassignable, the beneficiary may "assign his right to proceeds."[5] Since petitioner had this right, he could have obtained the proceeds by assigning

---

[4]Tex. Code Bus. & Com. Ann. sec. 5.106(a)(2) (1968), states as follows:

Sec. 5.106. *Time and Effect of Establishment of Credit*

(a) Unless otherwise agreed a credit is established

\* \* \* \* \* \* \*

(2) as regards the beneficiary when he receives a letter of credit or an authorized written advice of its issuance.

(b) Unless otherwise agreed once an irrevocable credit is established as regards the customer it can be modified or revoked only with the consent of the customer \* \* \* .

[5]Tex. Code Bus. & Com. Ann. sec. 5.116 (1968), is as follows:

Sec. 5.116. *Transfer and Assignment*

\* \* \* \* \* \* \*

(b) Even though the credit specifically states that it is nontransferable or nonassignable the beneficiary may before performance of the conditions of the credit assign his right to proceeds. Such an assignment is an assignment of a contract right under Chapter 9 on Secured Transactions and is governed by that chapter except that

(1) the assignment is ineffective until the letter of credit or advice of credit is delivered to the assignee which delivery constitutes perfection of the security interest under Chapter 9; and

(2) the issuer may honor drafts or demands for payment drawn under the credit until it receives a notification of the assignment signed by the beneficiary which reasonably identifies the credit involved in the assignment and contains a request to pay the assignee; and

(3) after what reasonably appears to be such a notification has been received the issuer may without dishonor refuse to accept or pay even to a person otherwise entitled to honor until the letter of credit or advice of credit is exhibited to the issuer.

(c) Except where the beneficiary has effectively assigned his right to draw or his right to proceeds, nothing in this section limits his right to transfer or negotiate drafts or demands drawn under the credit.

his rights thereto to someone else.[6] His rights under the letter of credit were, therefore, equivalent to cash.

In his brief petitioner takes the position that "the letter of credit is not equivalent to cash because a bank can go broke" and points out that this "was not a deposit and it was not insured by FDIC." The solvency or insolvency of the obligor is an important factor in determining cash equivalency.[7] However, in case of an issuing bank's insolvency, the security held or the funds provided to the bank to cover the credit are separate from the general assets of the bank. Tex. Code Bus. & Com. Ann. sec. 5.117 (1968).[8] In any event, there is not a word of evidence suggesting that Security Bank was not fully solvent and, indeed, a thriving institution. And the undisputed fact is that the letter of credit was honored and paid when presented. *Whitlow v. Commissioner*, 82 F.2d 569, 571 (8th Cir. 1936).

While it is true that the letter of credit was not to be

---

[6]In N.J. Uniform Commercial Code Study Commissioner and Report 474 (1960), it is stated:

(2) " An assignment of the proceeds of a letter of credit must be sharply distinguished from an assignment of the credit itself. Where proceeds alone are assigned, the buyer's protection arising out of the beneficiary's duty to perform is not defeated; it matters not to him who receives the funds from the bank. "From the bank's point of view, there should be no objection to such an assignment. If the assignee properly notifies the bank of the assignment, the bank is required to recognize it, and to pay, according to the tenor of the assignment, whatever would otherwise have been payable to the original beneficiary." See Harfield, Secondary Uses of Commercial Credits, 44 Colum. L. Rev. 899, 908 (1944). In line with these notions, subsection 5—116(2) permits proceeds to be assigned."

*Bankers Manual on the Uniform Commercial Code, p. 78, sec. 5.16 (1958),* states:

"The Code removes whatever doubts there may have been as to the right of a beneficiary to assign his right to proceeds by making proceeds assignable under any letter of credit, even when, in a rare case, it expressly states that it is non-assignable or non-transferable [5–116(2)]. The words "non-transferable" and "non-assignable" in a letter of credit are in effect limited by the Code to refer only to transferability of the right to draw drafts or demands for payment.

"an assignment of proceeds to which the Code applies is ineffective without delivery of the credit to the assignee, who then has a perfected security interest without necessity of filing [5–116(2)(a); 9–305]."

[7]In *Cowden v. Commissioner,* 289 F.2d 20, 24 (5th Cir. 1961), revg. and remanding 32 T.C. 853 (1959), the court, discussing a promissory note, said:

"A promissory note, negotiable in form, is not necessarily the equivalent of cash. Such an instrument may have been issued by a maker of doubtful solvency * * * [and thereby it might be] denied a ready acceptance in the market place. * * * [But where] a promise to pay of a solvent obligor is unconditional and * * * frequently transferred * * * such promise is the equivalent of cash * * * . [Fn. ref. omitted.]"

[8]An officer of Security Bank testified:

Q. Would the money [underlying the letter of credit] have been returned to the gin if it had asked for it?

A. No sir.

Q. Would it be correct to state that this money was irrevocably set aside and was being held by the bank for Sonny Watson?

A. Exactly, it was identified as his funds.

presented and paid until January 10, 1974, this was only 10 days after the close of the 1973 taxable year and less than 6 weeks after the sale of the cotton. We do not think this short delay in an assignee's receiving the proceeds of the letter of credit would have adversely affected the amount petitioner could have obtained through an assignment of such proceeds. The effect of such a short delay is not substantially different from the effect of short term promissory notes payable in a later year.[9] In substance the letter of credit was equivalent to cash. The fair market value of petitioner's rights under the letter was equal to its face amount. Any possible discount would have been negligible.[10]

In summary, it is clear that petitioner's sale of his cotton was a completed transaction in 1973. As consideration for the sale and by prearrangement, he received the banker's letter of credit which was readily convertible to cash through an assignment of his right to its proceeds. It was in every real sense equivalent to cash, and he could decide when and whether he would convert it to cash by assigning the proceeds. His rights under the letter of credit were not materially different from the receipt of stock in a closelyheld corporation, *Griffiths v. Commissioner*, 308 U.S. 355, 358 (1939); rights to an escrow account which the taxpayer controlled, *Williams v. United States*, 219 F.2d 523, 527 (5th Cir. 1955); *Oden v. Commissioner*, 56 T.C. 569, 575 (1971); *Pozzi v. Commissioner*, 49 T.C. 119, 127 (1967); or an employee's rights as the beneficiary of a trust created by his employer to provide additional compensation, *Sproull v. Commissioner*, 16 T.C. 244, 247–248 (1951), affd. per curiam 194 F.2d 541 (6th Cir. 1952); *Jacuzzi v. Commissioner*, 61 T.C. 262, 266–267 (1973).[11]

---

[9]In *Pinellas Ice Co. v. Commissioner*, 287 U.S. 462, 469 (1933), the Supreme Court said with reference to short term promissory notes:

"It would require clear language to lead us to conclude that Congress intended to grant exemption to one who sells property and for the purchase price accepts well-secured, *short-term notes, (all payable within four months)*, when another who makes a like sale and receives cash certainly would be taxed. * * * *In substance the petitioner sold for the equivalent of cash;* the gain must be recognized. [Emphasis added.]"

[10]A Security Bank official testified that the bank did not take letters of credit as security for loans and would not have advanced the proceeds of the letter of credit until Jan. 10, 1974. We do not interpret his testimony, however, to mean that the rights to the proceeds of the letter were not assignable or that, as a factual matter, petitioner could not have obtained cash in consideration of an assignment of his right to the proceeds.

[11]While the last two cases involve compensation taxable under sec. 61 rather than the proceeds of property sales subject to sec. 1001(b), they are apposite in terms of the timing of the receipt of the taxable income.

To reflect the foregoing,[12]

*Decision will be entered for the respondent.*

---

[12]We do not reach a series of other arguments advanced by respondent to support taxation of the crop proceeds in 1973. Cf. *Schniers v. Commissioner,* 69 T.C. 511 (1977).