FRED M. WILMOTH and FRANCES H. WILMOTH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wilmoth v. Commissioner
Docket No. 9602-76.
United States Tax Court
T.C. Memo 1979-314; 1979 Tax Ct. Memo LEXIS 210; 38 T.C.M. (CCH) 1216; T.C.M. (RIA) 79314; August 14, 1979, Filed Thomas N. Chambers,James H. Nix and Louis S. Southworth, II, for the petitioners. Juandell D. Glass, for the respondent. SCOTT MEMORANDUM *210 FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the taxable year 1972 in the amount of $52,371. The issue for decision is whether petitioners are entitled under section 453, I.R.C. 1954, [1] to report their gain on the sale of bank stock *211 on the installment method. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, Fred M. Wilmoth and Frances H. Wilmoth, who resided in Vienna, West Virginia at the time of filing their petition in this case, filed a joint Federal income tax return for the calendar year 1972 with the Internal Revenue Service Center in Parkersburg, West Virginia. Petitioners kept their records and filed their Federal income tax returns on the cash basis of accounting. In September of 1967, Mr. Theodore Morlang purchased 4,135 of an outstanding 4,500 shares of capital stock in Union Trust and Deposit Company. Mr. Morlang made the purchase on behalf of, and for the equal benefit of, himself, Mr. Wilmoth (hereinafter *212 petitioner), Mr. Paul Goff and Mr. Charles Artman. Certificates for the stock were registered in Mr. Morlang's name, except for five shares registered in each of the other participant's names as director's qualifying shares. The shares not used as director's qualifying shares were pledged on loans of $2,088,175 made by The Central Trust Company of Cincinnati, Ohio to the participants to purchase the stock. Following the purchase the stock was split 10-for-1 to bring the total shares held by the participants to 41,350. An agreement was signed by the four shareholders on September 16, 1967, with respect to the interest of each participant in the stock and his obligations with respect to the stock. This agreement contained a provision that in the event any participant desires to sell his shares, he must first offer them in writing to the other participants holding shares under the agreement. After purchase of the stock, petitioner, Messrs. Morlang, Goff and Artman were the controlling stockholders of Union Trust and Deposit Company. The Union Trust and Deposit Company subsequently received a national bank charter and was renamed the Union Trust National Bank (hereinafter UTNB). *213 Mr. Morlang served as chairman of the board of UTNB until March 1, 1973, when he was relieved of his duties, although he retained the title until May 9, 1973. Messrs. Goff and Artman served as president and administrative vice president of UTNB, respectively, until they resigned on June 15, 1973. Additionally, Messrs. Morlang, Goff and Artman served as directors of UTNB from the time they acquired their shares. Petitioner was indicated in 1969 as a result of an Internal Revenue Service investigation of his income tax liability for the years 1962 and 1963 and was therefore not eligible to hold office in a national bank. Petitioner never became an officer or director of UTNB. In 1968, petitioner and Mr. Morlang undertook a joint venture to develop and construct certain housing projects. Part of the funds used in the business of the joint venture came from loans petitioner received from UTNB. Petitioner borrowed on demand notes various amounts from UTNB which on December 22, 1972, totaled $169,309. The following schedule shows the date of the demand notes, their original balance, payments and balance as of December 22, 1972: Original
Balance Notes
Balance
Payments
Dec. 22, 1972
Sep. 27, 1968
$64,800.00
$4,491.19
$ 60,308.81
Nov. 8, 1968
10,000.00
0
10,000.00
Nov. 25, 1968
10,000.00
0
10,000.00
Dec. 20, 1968
65,000.00
0
65,000.00
Mar. 11, 1971
6,000.00
0
6,000.00
Dec. 15, 1972
18,000.00
0
18,000.00
$169,308.81
*214 Interest payments had been made at various dates on these notes. Petitioner was the only maker of these notes which were not secured by collateral, although petitioner had given the bank his financial statement. However, petitioner considered the loans to be loans of the joint venture.For that reason, as between himself and Mr. Morlang, he considered Mr. Morlang to be responsible for payment of one-half the interest and repayment of all or part of the loans. The joint venture was not financially successful. In late 1972, petitioner asked Mr. Morlang for an accounting with respect to the joint venture. Petitioner was of the opinion that he had more invested in the joint venture than did Mr. Morlang, and petitioner requested Mr. Morlang to bring his investment up to petitioner's or to assume the UTNB obligation.
In 1972, petitioner was tried twice as a result of a 1969 indictment involving his Federal income taxes for the taxable years 1962 and 1963. Petitioner's conviction at his first trial was set aside by the District Court Judge. Upon retrial, petitioner was found innocent of Federal income tax evasion but guilty of a misdemeanor. In 1973, petitioner's conviction of *215 a misdemeanor was upheld on appeal. After his second trial in 1972, petitioner wanted to sell, and Messrs. Morlang, Goff and Artman wanted to buy, the UTNB shares held for petitioner. Petitioner, as well as the other stockholders of UTNB, considered petitioner's ownership of stock in the bank not to be in the best interest of UTNB because the adverse publicity received by petitioner in connection with his criminal trials might reflect on the bank. Also in 1972 the bank directors became concerned that the bank examiners might question the $169,309 loans which were unsecured except for petitioner's financial statement. Negotiations for sale of the stock began with petitioner asking for the full purchase price of the stock in cash and the purchasers asking that the $169,309 loan from UTNB to petitioner be paid by petitioner out of the proceeds of the sale. At the same time, negotiations between petitioner and Mr. Morlang for an accounting and equalization of their joint venture investment continued. Messrs. Morlang, Goff and Artman applied to the Charleston National Bank for a loan with which to pay petitioner for his stock interest. The requested loan in the amount of $300,000 *216 was granted on November 21, 1972, and the amount of the loan to Messrs. Goff, Artman and Morlang was disbursed by the Charleston National Bank by credit memorandum to UTNB on December 8, 1972. An agreement with respect to the sale of the stock was entered into by petitioner and Messrs. Morlang, Goff and Artman on December 22, 1972. This agreement provided in part as follows: It now appearing to all the parties to said Agreement and to this Release and Agreement that one of said parties, FRED WILMOTH, desires to dispose of all his right, title and interest in and to the shares of stock in the Union Trust and Deposit Company purchased pursuant to the terms of the Agreement of September 16, 1967, and held on his behalf by THEODORE MORLANG, and to dispose of all right, title and interest which he might have in said shares of stock and into any and all other shares of stock held by the said THEODORE MORLANG on behalf of any of the parties to said Agreement in accordance with the terms thereof, and to release the said THEODORE MORLANG, PAUL GOFF, and CHARLES ARTMAN from all of the provisions of said Agreement of September 16, 1967, and to fully and completely remove himself from participation *217 in said Agreement and participation in any way from the Union Trust and Deposit Company, save and except any shares the said FRED WILMOTH might hold personally other than shares represented by the terms of the Agreement of September 16, 1967, then, therefore, the parties agree as follows: FOR AND IN CONSIDERATION of the sum of Three Hundred Twenty Two Thousand Six Hundred Forty and 00/100 ($322,640.00) Dollars, Two Hundred Fifty Thousand ($250,000.00) Dollars of which is paid to the said FRED WILMOTH in cash, and Seventy Two Thousand Six Hundred Forty and 00/100 ($72,640.00) Dollars of which is in the form of a Promissory Note, the said FRED WILMOTH does hereby RELEASE, RELINQUISH, GRANT and CONVEY unto THEDORE MORLANG, PAUL GOFF, and CHARLES ARTMAN all of his right, title and interest in and to any of the shares of stock purchased by the parties pursuant to and in accordance with the terms of the Agreement of September 16, 1967, and does hereby release THEODORE MORLANG, PAUL GOFF and CHARLES ARTMAN from any and all terms of said Agreement from this day forward to the end of the world. It is the intention of this agreement that in consideration with the promises made by each party *218 to the other, the conveyance of the stock interest of FRED WILMOTH to THEODORE MORLANG, PAUL GOFF and CHARLES ARTMAN, and the payment of said cash and Promissory Note by THEODORE MORLANG, PAUL GOFF and CHARLES ARTMAN to FRED WILMOTH, that all interest whatsoever of the said FRED WILMOTH in and to the Agreement of September 16, 1967 be and hereby is terminated, extinguished, released and finalized. Petitioner had a cost basis of $36,173 in his UTNB stock. On December 22, 1972, an agreement was entered into by Mr. Morlang and petitioner which provided in part as follows: WHEREAS, The parties have simultaneously with the execution hereof entered into an agreement along with Paul Goff and Charles Artman, the general purport of which is the sale and transfer of the capital stock of UNION TRUST NATIONAL BANK currently owned by the party of the first part, the purchase and transfer thereof to the said party of the second part, Paul Goff and Charles Artman as may be determined by them, and, WHEREAS, The party of the second part, Paul Goff and Charles Artman are paying to the said party of the first part the sum of TWO HUNDRED FIFTY THOUSAND and 00/100 ($250,000.00) DOLLARS in *219 the form of cash and a negotiable promissory note for Seventy Two Thousand Six Hundred Forty and 00/100 ($72,640.00) Dollars, the cash money to be disbursed as follows: 1. To the Mountain State Bank and Fred M. Wilmoth the sum of Sixty One Thousand Two Hundred Sixty Seven and 00/100 ($61,267.00) Dollars, to be used to pay off a negotiable promissory note in favor of said Mountain State Bank in that amount. 2. The sum of One Hundred Sixty Nine Thousand Three Hundred Nine and 00/100 ($169,309.00) Dollars to be deposited in the UNION TRUST NATIONAL BANK as a collateral assignment to be placed in a savings account, and to be kept and maintained in keeping with the terms of said collateral assignment, a copy of which is attached hereto and made a part hereof. The interest earned by said savings account is to be credited on the amount of that certain negotiable promissory note heretofore executed by the party of the first part, the outstanding principal balance of which is One Hundred Sixty Nine Thousand Three Hundred Nine and 00/100 ($169,309.00) Dollars, as said interest accrues and is paid. 3. The balance of cash, Nineteen Thousand Four Hundred Twenty Four and 00/100 ($19,424.00) *220 Dollars is to be paid to the said Fred M. Wilmoth upon his execution of the subject documents. The party of the first part and the party of the second part do hereby agree that in the resolution of the joint ventures heretofore entered into by them, complete, accurate and certified accountings will be made, and such credits or debits as are determined are due and owing by or to the said Fred M. Wilmoth in the final resolution and settlement of said ventures, shall be reflected as credits or debits against said note, so that in the event the entire amount of said note as secured by said assignment, shall not be necessary as a credit to the party of the first part against his share of the indetedness of said joint ventures, then that portion of said note as shall not be so required shall be a credit to the party of the first part and a debit to the party of the second part, and shall be the obligation of the party of the second part to pay said sum to the credit of the joint venture. In the event the debits of the party of the first part exceed the amount of said note plus other credits inuring to the party of the first part, then the amount of said excess of debits shall be charged *221 to the account of the party of the first part and it shall be his liability to pay said sum to the credit of the joint venture. On December 22, 1972, UTNB disbursed $250,000 of the proceeds of the loan to Messrs. Goff, Morlang and Artman by cashier's checks, each dated December 22, 1972, as follows: (1) Cashier's check No. 8390 to the order of UTNB for $3,909 with remitter "Fred M. Wilmoth -- interest." (2) Cashier's check No. 8387 to the order of UTNB for $169,309 with remitter "Fred M. Wilmoth, Frances Wilmoth Savings Account." (3) Cashier's check No. 8388 to the order of Fred M. Wilmoth and Mountain State Bank for $61,267 with remitter "Fred M. Wilmoth." (4) Cashier's check No. 8389 to the order of Fred M. Wilmoth in the amount of $15,515. Under date of December 27, 1972, a joint savings account No. XX8615 with an initial deposit of $169,309 was opened at UTNB in the names of "Fred M. Wilmoth or Frances H. Wilmoth, payable to either or the survivor of either." Both the signature of petitioner and Mrs. Wilmoth appeared on lines for "signature owner." Under date of December 22, 1972, petitioner signed a "Collateral Assignment," assigning and pledging to UTNB Savings *222 Account No. XX8615 as security for all debts to UTNB incurred by him at the present time or in the future. The funds disbursed by cashier's check No. 8390 for $3,909 to the order of UTNB was to bring interest on petitioner's $169,309 loan up to date. This check was posted to petitioner's loan account on December 26, 1972. In May or June of 1973, the stock of UTNB was sold by Messrs. Goff, Morlang and Artman. Beginning May 9, 1973, the minutes of the board of directors reflected that a discussion of the loans to petitioner was held. Petitioner was notified that his loans should be paid by July 12, 1973, or the bank would use the collateral to pay the loans. On July 23, 1973, the bank did use the collateral to pay petitioner's loans. Interest in the total amount of $3,927.25 was credited to petitioner's and Mrs. Wilmoth's Savings Account No. XX8615 by entries made January 1, April 1, and July 1, 1973. The following shows the application by UTNB of the savings account in payment of petitioner's loans: Loan Balance
$169,308.81
Accrued Interest
7,107.81
$176,416.62
Savings Account (applied
to loans-July 23, 1973)
-173,236.25
Balance Due $ 3,180.37
August 31, 1973-Received
1,680.37
Due $ 1,500.00
*223 On July 14, 1973, petitioner and Mr. Morlang entered into another agreement pertaining to the final accounting and settlement of their joint venture project. This agreement provided in part: The parties hereto agree that Wilmoth has invested the following sums in the projects subject to verification: $169,308.81
(Union Trust Bank loan)
61,200.00
(Mountain State Bank loan)
11,601.10
(Etna Insurance Company premiums
not shown upon the books of Hawkins)
140,239.62
Total of cash investment of Wilmoth
$382,349.53
TOTAL
The parties hereto further agree that Morlang will execute and deliver to J. Fred Earley, as escrow agent, a note payable to Fred M. Wilmoth in the amount of $127,097.36, which said note shall be due and payable on January 1, 1976, shall bear interest at the rate of 7% per annum [and] shall be dated by the escrow agent in accordance with the escrow agreement. The escrow agent shall hold the said note until the completion of the determination of the items of dispute provided for in this agreement or until December 1, 1973, whichever date shall first occur. If the results of the said audit show that Morlang is indebted to Wilmoth in an *224 amount less than the face amount of the said note, then the said escrow agent is authorized to credit the said amount upon the said note prior to the delivery of the same to Wilmoth. If the results of said audit show that Morlang is indebted to Wilmoth in an amount greater than the fact [sic] amount of the said note, then Morlang agrees to execute another note for the difference upon the termination of the escrow agreement. At the time of the trial of this case, petitioner and Mr. Morlang had not settled their differences with respect to the joint venture operation and a civil action with respect to these differences was pending. In 1974, the $72,640 promissory note given by Messrs. Goff, Morlang and Artman in connection with the purchase of petitioner's stock interest was paid in full. In his 1972 Federal income tax return, petitioner elected to report his stock sale as an installment sale giving rise to capital gains. Although the original return reported receipt under that method of $91,939 in 1972, petitioner's amended return filed on or about July 20, 1974, reported receipt of $80,566 of the purchase price in 1972 with a corresponding long-term capital gain of $71,333. *225 [2] The $80,566 figure represents the total sales price less the $169,309 check and less the $72,640 promissory note. On petitioner's 1973 Federal income tax return, he reported receipt of $169,434 and a corresponding long-term capital gain of $150,017. [3]
Respondent in his notice of deficiency disallowed petitioner's election of the installment method for reporting gain from the stock sale with the following explanation: It is determined that you realized a net long-term capital gain of $285,667 in 1972 from the sale of your interest in the joint venture investment in Union Trust National Bank stock in 1972 instead of $81,403 which you reported *226 in 1972 and $150,017 which you reported in 1973 as gains from an installment sale. This gain is taxable income subject to 50 percent deduction provided by section 1202 of the Internal Revenue Code. * * *
It is determined that your net operating loss for the taxable year 1973 is $60,225 as computed in Exhibit B-1 instead of $41,232, which you claimed on your return. Further, it is determined that this loss results in a carryback deduction to 1972 of $9,174 computed under the provisions of section 172 of the Internal Revenue Code. The computation of the net operating loss deduction is shown in Exhibit B-2. OPINION Section 453 provides for an election by a taxpayer to report income under the installment method. Under the provisions of section 453(b)(1)(B), income from a casual sale or other casual disposition of personal property which is not of a kind properly includable in inventory may be reported on the installment basis. However, in order for a taxpayer to be entitled to report a sale on the installment basis, in the year of *227 the sale there must be no payments on the selling price or the payments, exclusive of evidences of indebtedness of the purchaser, must not exceed 30 percent of the selling price. [4]
In the instant case the parties agree that petitioner in 1972 made a casual sale of personal property when he sold his UTNB stock interest and that petitioner *228 on his 1972 Federal tax return elected to report the sale of that property on the installment basis. There is also no disagreement between the parties as to the amount of the selling price of petitioner's interest in the UTNB stock. Although respondent makes some argument that the sale involved in this case was not an installment sale, the evidence is clear that a promissory note was given by the purchasers to petitioner for $72,640 of the selling price. Under the facts here shown, regardless of the conclusion we reach with respect to the payment made to petitioner in 1972, the year of the sale, a part of the selling price was to be paid in a subsequent year when the $72,640 note was paid. Therefore, since under section 453 evidences of indebtedness of the purchaser are excluded from payments in the year of sale, there was provision in the sales agreement for at least two payments to be made on the selling price in different years. The real issue between the parties is whether the payments received by petitioner in 1972, the year of sale, exceeded 30 percent of the selling price. Petitioner argues that the only payments received in the year of sale consisted of the $61,267 represented *229 by the cashier's check made payable to petitioner and Mountain State Bank which was used to pay off a loan of petitioner to that bank; [5] the $3,909 represented by the cashier's check drawn to the order of UTNB, with the remitter "Fred M. Wilmoth--interest," which was used to pay interest on the loans totaling $169,308.81 which petitioner had from UTNB; and the $15,515 paid by a cashier's check to petitioner. Petitioner argues that the $169,309 represented by the cashier's check drawn to the order of UTNB showing petitioner and Frances H. Wilmoth savings account as the remitter, which was placed in a savings account in the joint names of petitioner and Mrs. Wilmoth and assigned by petitioner to UTNB as collateral for his loan, was not a payment to petitioner in 1972. Petitioner contends that the $169,309 placed in the savings account did not constitute a payment to petitioner until July of 1973 when his demand notes were called and, because of his failure to pay the notes, the $169,309 savings account pledged as collateral was used to discharge his indebtedness.Petitioner argues that since the placing of the $169,309 in a savings account which petitioner was to use as collateral *230 for his debt to UTNB was necessary in order to have the parties agree to the sale, effectively this $169,309 was placed in an escrow account. Petitioner then concludes that there were substantial limitations on his right to receive this escrow account. In petitioner's view, his disagreement with Mr. Morlang with respect to their respective contributions to the joint venture, particularly the disagreement as to which of them should be responsible for the furnishing of the funds with which to pay the $169,309 loans petitioner had made at UTNB, and their disagreement as to their respective responsibilities to their joint venture were integral parts of the agreement for the sale of petitioner's stock interest. Petitioner argues that his right of receipt from the "escrow" of the $169,309 was dependent upon whether his indebtedness to UTNB was in the final agreement between him and Mr. Morlang determined to be paid from his funds or funds of Mr. Morlang. On this basis petitioner attempts to equate the facts in this case with the facts in McArdle v. Commissioner,11 T.C. 961 (1948), in which the sellers of stock were required to return a portion of the purchase price *231 of that stock to the buyer to guarantee the buyer against loss on accounts receivable and contingent liabilities which as a part of the sales agreement the sellers had guaranteed not to exceed a specific sum. Petitioner also argues that the facts here are comparable to those in Stiles v. Commissioner,69 T.C. 558 (197), in which 75 percent of the redemption price of the taxpayer's stock was placed in a trust fund to secure the redeeming corporation against any breaches of certain warranties which the taxpayer-seller had given with respect to the stock. In both the Stiles and McArdle cases the controlling fact was that the selling taxpayer did not have an unconditional right to receive the amount withheld and placed in escrow or trust. If certain contingencies occurred, a part of the escrow or trust account would be paid back to the purchaser to compensate the purchaser for breach of the seller's warranties. In the McArdle case if the accounts receivable *232 collected by the buyer had been less than the amount guaranteed by the taxpayer, the seller of the stock, or the contingent liabilities had been greater than the amount represented by the seller, a portion of the selling price of the stock would have been returned to the buyer to compensate for the deficiencies in the accounts receivable or the excess of the contingent liabilities. In the Stiles case, in distinguishing certain other cases of deferred actual payment, we pointed out that in those other cases the funds placed in trust were not subject to substantial conditions or limitations other than time of payment. We stated: "The funds would eventually be paid to the taxpayers in any event." Stiles v. Commissioner,supra at 569. We then went on to point out that the Stiles case was more comparable to Murray v. Commissioner,28 B.T.A. 624 (1933), which is also relied on by petitioner in the instant case, since in each of these cases the taxpayer might never receive a part of the funds because these funds were subject to claims which might arise under guarantees made by the taxpayer. In Carpenter v. Commissioner,34 T.C. 408 (1960), *233 also cited in the Stiles case, the facts showed that a taxpayer, in order to have the sale of her stock consummated, was required to agree to the withholding of a portion of the proceeds until a suit with respect to whether she had good title to the stock was finally determined. We held that the taxpayer had not received the amount so held in the year of the sale. We pointed out that there was an actual question as to the taxpayer's title to the stock involved since "13 unified law suits questioning her title were pending" and the purchasers knew of them. Had the taxpayer's title to any portion of the stock been defective, she would never have received all the withheld portion of the purchase price. In such event, at least a part of the withheld amount would have belonged to the purchaser. The facts in the instant case are in no way comparable to the facts in the cases on which petitioner relies. In the instant case no amount was placed in an "escrow" or "trust" account.In this case, as between petitioner and UTNB, petitioner was liable on demand notes totaling $169,308.81. Petitioner himself recognized this fact when he testified with respect to these notes: I borrowed *234 money at the Mountain State Bank and at the Union Trust Bank. And at the Union Trust Bank, I borrowed it in my own name alone, since Mr. Morlang was an officer of that bank, it was easier to do it that way. * * *
* * * the Mountain State Bank, I was the maker of the note at the Mountain State Bank and Mr. Morlang was an endorser. But on the Union Trust Bank, I was the maker of the loan alone. Also, the other evidence in the record consisting of records of the bank clearly shows that petitioner alone had borrowed the funds on demand notes from UTNB and only he was obligated to pay these loans when demanded. [6] Any understanding or agreement between petitioner and Mr. Morlang concerning any reimbursement that Mr. Morlang might be obligated to make to petitioner with respect to the funds borrowed by petitioner from UTNB in no way affected petitioner's liability to the bank. We do not have adequate evidence in this record to determine the rights with respect to the joint venture as between petitioner and Mr. Morlang. In fact, at the time of the trial of this case a suit brought by petitioner against Mr. Morland in an effort to determine those rights was still pending. However, *235 for the purpose of this case petitioner's agreement with Mr. Morland as to the joint venture has no relevance to the issue of petitioner's obligation to pay the demand notes. We set forth some of the items with respect to the various agreements between petitioner and Mr. Morlang regarding an accounting of the operations of that joint venture merely for the purpose of intelligently discussing petitioner's contention and showing that in fact those agreements in no way bore on petitioner's rights with respect to the savings account of $169,309 established in his and his wife's names at UTNB, or petitioner's indebtedness on demand notes to UTNB. *236 The cases relied on by petitioner are totally distinguishable on their facts from the instant case. We simply do not agree with petitioner that this record shows that any agreement which he and Mr. Morlang might reach with respect to their joint venture would affect petitioner's liability to pay his demand notes to UTNB or cause UTNB not to be entitled to apply the savings account assigned to it as collateral in payment of those notes if, upon demand, petitioner did not pay them. On the facts here, petitioner in 1972 had received a sum which would pay his demand notes to UTNB or, if he opted to otherwise pay those notes, would be released free and clear to him. It is also completely clear from the facts in this case that other than the $72,640 note given as part of the payment for the stock, none of the purchasers of the stock would under any circumstances be obligated to pay petitioner any additional amounts and under no circumstances would they receive any return of any of the $250,000 which had been disbursed in payment for petitioner's UTNB stock interest. The agreement between the purchasers of petitioner's stock and petitioner was that petitioner would receive $250,000 *237 in cash. The testimony of Mr. Goff is that the purchasers would not have agreed to buy petitioner's stock if petitioner had not agreed to pay the demand notes he had at UTNB from the purchase price funds or from other funds. Mr. Goff's testimony was that before making a final agreement to purchase the stock he was told by Mr. Morlang that petitioner had agreed to put up cash collateral in the form of a savings account with UTNB in the full amount of the notes to guarantee the notes and that in his view this was as satisfactory an arrangement as actual payment of the notes. Petitioner testified that although, because of his disagreements with Mr. Morlang with respect to their joint venture, he was unwilling to use part of the cash to actually pay the notes, he agreed to put up the savings account as collateral for the notes. The record does not show who suggested that the notes be collateralized by the savings account, but we consider this unimportant. [7]
*238 The fact is that cash funds had been transferred to petitioner either to discharge his indebtedness of $169,309 to UTNB or, if he chose, to discharge that indebtedness from other funds to be released to him in the form of a savings account. Under these circumstances petitioner had received the payment of the $169,309 upon the opening of the savings account. Under no circumstances would petitioner not receive all the $169,309 or the benefit thereof. He would either receive the money from the savings account or the payment of his note with the funds from the savings account. Under these circumstances we conclude that petitioner received the $169,309 in 1972. In this respect this case is as a matter of law comparable to Rickey v. Commissioner,54 T.C. 680, 693-694 (1970), affd. 502 F.2d 748 (9th Cir. 1974). In the Rickey case we held that a cancellation of a taxpayer's obligation constituted a payment in the year the obligation was canceled even though the amount that would have been paid to the taxpayer, except for such cancellation, would not have been paid until the following year. See also Hammond v. Commissioner,1 T.C. 198 (1942). *239 The fact that a payment of an indebtedness of a taxpayer by another, in a situation in which the payment is not a gift, may result in income to the person whose indebtedness is discharged is so fundamental in tax law that it needs no citation of authority.Had the $169,309 been applied directly to pay petitioner's indebtedness to UTNB in 1972, clearly this amount would have been income to petitioner in 1972. The fact that the amount was put in a savings account in petitioner's name which was used as collateral to secure petitioner's loan to UTNB instead of being a direct payment of that loan is not different in substance from a direct payment of petitioner's loan to UTNB out of the sales proceeds. While the facts here are different from those in certain other cases where we have drawn a similar conclusion as to the substance of the transaction, the principle is indistinguishable. See, e.g., Watson v. Commissioner,69 T.C. 544 (1978); Oden v. Commissioner,56 T.C. 569 (1971); Pozzi v. Commissioner,49 T.C. 119 (1967); Bonham v. Commissioner,33 B.T.A. 1100 (1936), *240 affd. 89 F.2d 752 (8th Cir. 1937). See also Sprague v. United States, an unreported case ( W.D. Okla. 1978, 42 AFTR 5877, 1978-2 USTC par. 9650), which relies primarily on Watson v. Commissioner,supra.
We hold on the facts of this case that petitioner received in excess of 30 percent of the sales price of his interest in the UTNB stock in 1972, the year of the sale. Therefore, petitioner is not entitled to report his sale of his interest in UTNB stock on the installment basis. Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
2. $285,667 (Total Gain) / 322,640 (Total Sales Price) X $80,566 (Sales Price received in 1972) = $71,333 (Gain) ↩
3. $285,667 (Total Gain) / 322,640 (Total Sales Price) X $169,434 (Sales Price received in 1973) = $150,017 (Gain) On his 1973 Federal income tax return petitioner also reported a loss of $156,536 on the joint venture arrived at by subtracting from a computed loss of $283,633 the $127,097 amount of the note made payable to him by Mr. Morlang. The $156,536 claimed loss was allowed on audit of petitioner's 1973 return.↩
4. Sec. 453(b)(1) and (2) provides: SEC. 453. INSTALLMENT METHOD. * * *
(b) Sales of Realty and Casual Sales of Personalty-- (1) General rule.--Income from-- (A) a sale or other disposition of real property, or (B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the cl6se of the taxable year) for a price exceeding $1,000, may (under regulations prescribed by the Secretary) be returned on the basis and in the manner prescribed in subsection (a). (2) Limitation.--Paragraph(1) shall apply only if in the taxable year of the sale or other disposition-- (A) there are no payments, or (B) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.↩
5. Petitioner testified that he was the prime obligor on this loan and that the loan was endorsed or guaranteed by Mr. Morlang. In any event, petitioner recognizes this as a payment to him in 1972.↩
6. While there does not appear to be any disagreement of the parties on the question of petitioner's liability to the bank or that petitioner's demand notes were subject to be called for payment from the date of their execution, the West Virginia law on this subject is clear. W. Va. Code Ann., sec. 46-3-108 (1966). W. Va. Code Ann., sec. 46-3-122 (1966), provides for the accrual of a cause of action on a demand instrument upon its date. W. Va. Code Ann., sec. 46-3-401 (1966), provides that no person is liable on an instrument unless his signature appears thereon. W. Va. Code Ann., sec. 46-3-403 (1966), sets forth the requirements of the form of signature of an agent and provides that the signer is personally obligated if the instrument does not name the person for whom he is agent nor show that it is signed in a representative capacity. See also Steeley v. Funkhouser,169 S.E.2d 701↩ (W.Va.S.Ct.App. 1969).
7. We have difficulty following some of the testimony in this case. The record shows that apparently the oral agreement with respect to the sale of the stock and the payment of the UTNB notes had been reached in November or at least by December 8, 1972, when the funds borrowed by the purchasers of the stock to make the purchaserwere transferred over to their account at UTNB. However, the final $18,000 demand note of petitioner was dated December 15, 1972. In any event, we do not consider this unexplained situation to be of any consequence in our disposition of this case.↩