ROBERT N. FAILLA AND ANN MARIE FAILLA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ANN MARIE FAILLA TRUST, ANN MARIE FAILLA, TRUSTEE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Failla v. Commissioner
Docket Nos. 29077-83, 29078-83.
United States Tax Court
T.C. Memo 1986-39; 1986 Tax Ct. Memo LEXIS 565; 51 T.C.M. (CCH) 355; T.C.M. (RIA) 86039; January 29, 1986. Samuel N. Reikin, for the petitioners. William F. Halley, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: In these consolidated cases, respondent determined deficiencies in Federal income tax against petitioners as follows: Taxable year
Petitioner
ended
Deficiency
Robert N. Failla and
Ann Marie Failla
12/31/78
$269,020
Docket No. 29077-83
Ann Marie Failla Trust,
3/31/79
1,624
Ann Marie Failla Trustee
3/31/80
24,744
Docket No. 29078-83
3/31/81
27,325
After concessions in docket No. 29077-83, the issue presented for decision is whether the sale by Robert N. Failla of his Aero Gear Machine and Tool Corporation stock to the Ann Marie *567 Failla Trust should be regarded as a bona fide installment sale for purposes of section 453. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Robert N. Failla ("Robert" or "petitioner") and Ann Marie Failla ("Ann Marie") were husband and wife and residents of Short Hills, New Jersey, at the time their petition was filed. Robert and Ann Marie timely filed joint Federal income tax returns for their taxable years 1978, 1979, and 1980. Ann Marie, as trustee of the Ann Marie Failla Trust, timely filed Forms 1041, Fiduciary Income Tax Returns, for the Trust's taxable years ended March 31, 1979, March 31, 1980, and March 31, 1981. Aero Gear Machine and Tool Corporation ("Aero Gear") was a New Jersey corporation organized in 1955. Aero Gear was engaged in the manufacture of aerospace gears used in helicopter transmissions, accessory gear boxes *568 for commercial aircraft engines, and gas turbine gear boxes for gas compression, electrical generation, and fluid flow. Petitioner joined Aero Gear in 1973, and became a shareholder some three or four years later. For more than two years prior to April 14, 1978, Aero Gear's sole shareholders were petitioner, who owned 44 of the outstanding 100 shares, and William Spitz ("Spitz"), who owned 56 shares. Aero Gear never paid any dividends to its shareholders. In late 1976, Robert was contacted by William Vandersteel, a representative of Ampower, a New Jersey corporation and the American representative of Lohmann and Stuldtfutt ("L&S"). L&S was a member of the Mannesmann group, a West German conglomerate. Vandersteel stated that L&S was a distributor of gear units interested in the acquisition of a gear manufacturing company in the United States.Robert stated that he and Spitz were interested in such an arrangement. Representatives of L&S visited Aero Gear twice in 1977 to survey the facilities and review the corporation's financial statements. After doing this, they stated that they would consider Aero Gear as a potential acquisition.In August 1977, Robert and Spitz traveled *569 to Germany, where they met with representatives of G. L. Rexroth GmbH ("Rexroth"), another wholly owned subsidiary of Mannesmann, and discussed the possibility of Rexroth's acquisition of Aero Gear. The results of the meeting were set forth in a document entitled "Main points of agreement between Messrs. Spitz and Failla * * * and G. L. Rexroth GmbH * * *," dated August 12, 1977. The document provided, in pertinent part, as follows: 1. The sellers sell 100% of the shares of the Aerogear Corporation (afterwards called "the Company"), Little Ferry, to the buyer, provided, that the Board of the buyer resp. the Mannesmann AG give their approval to this acquisition. 2. As selling price of the shares the buyer shall pay $2.750.000, -- to the sellers after signing the final contract. * * * 3. The sellers shall as managers of the Company receive a salary of $50.000, -- per year, each. * * * 6. The search for land and qualified employees for the designing department shall start immediately after the approval of the acquisition by the Mannesmann AG. * * * The document was signed by Spitz, Robert, and the representatives of Rexroth. Petitioner and Spitz agreed to furnish *570 Rexroth's representatives with additional financial data, a detailed list of Aero Gear's customers, the extent and nature of Aero Gear's present and future business with the said customers, and information concerning the anticipated needs and approximate cost of manufacturing equipment should an acquisition take place. A memorandum entitled "Main points of contract concerning Aero Gear Corp.," dated March 10, 1978, and prepared by Rexroth recites, in pertinent part: 1) G. L. Rexroth forms a new company "American Lohmann Corp." or similar in the next weeks. 2) This new company buys the assets and assumes the liabilities from Aero Gear resp. from the shareholders of Aero Gear. For that is necessary an actual list of all assets (fixed assets, stocks, debtors etc.) and all liabilities up to the actual date of purchase, f.i. April 1st. These assets must be revaluated with the actual value at the date of purchase. The balance (assets minus liabilities) coming out is $2.750.000, --. The assets should include a goodwill for taking over the whole business of $200.000, --. 3) Payment by G. L. Rexroth the new company (A-L) is made as follows: 70% after closing of the contract
*571 30% at Sept. 30th 1979, if Mr. Spitz and Mr. Failla are still working for the company * * * 6) Perhaps the question of profit of Aero Gear for the period Jan. 1st to March 31st 1978 is raised by Mannesmann, because the first intention was, to purchase the company retrospective on Jan. 1st 1978. Eventually this question has to be discussed. 7) The promised bonus to the sellers is $750.000, --, which amount is to be paid under certain conditions in 1982 will be settled in the employment contracts of Mr. Spitz and Mr. Failla. * * * In early March 1978, Rexroth retained Harold Berger, a Philadelphia, Pa., attorney, as its counsel in the negotiations with Aero Gear. Aero Gear thereupon retained William D. Lipkind, a West Orange, New Jersey, attorney, as its counsel. On March 20, 1978, Rexroth sent a telex letter to Berger and instructed him to deal with the Aero Gear matter and to revise (1) the agreement between Aero Gear and American Lohmann Corporation ("Lohmann") for the purchase of the assets of Aero Gear, (2) the employment contract of Spitz and Robert with Lohmann, (3) the lease contracts between Aero Gear and Lohmann with respect to the land and buildings, located *572 in Little Ferry and Hillside, New Jersey, owned by Spitz and petitioner, and (4) Lohmann's by-laws. The telex provided, in pertinent part, as follows: * * * our schedule is as follows: 1. mid april 78 signing of the contracts acc. to paragraph 1, presumably on 14.4.78. 2. 1.5.78 taking over the assets. the new company american lohmann corporation should be incorporated before mid april. at the same time the contracts as to paragraph 1 should also be "ready for signature." in concrete this means: week commencing 20th march . . . preparing of contracts by yourself and mr. max s. mayer week commencing 27th march . . . presentation of contracts to mr. spitz and mr. failla, so that they have the possibility to discuss the same with their consultants. week commencing 3rd april . . . execution - necessary contract modifications and final discussion between both parties, resp. their conslutants. * * * Spitz was provided with a copy of the aforementioned telex. In late March 1978, Robert and Ann Marie met with Lipkind to discuss the potential consequences of the proposed sale of the assets of Aero Gear and its subsequent liquidation. Ann Marie expressed her concern *573 that upon the sale and subsequent liquidation of Aero Gear, Robert was to receive a substantial amount of money. Given the fact that Robert had been involved in a Chapter 11 bankruptcy proceeding in 1972, in connection with his involvement with another company, Ann Marie doubted his ability to manage money. Ann Marie wanted to safeguard any proceeds to be received from the said sale and subsequent liquidation and believed that she owned half of Robert's stock. Ann Marie was informed by Lipkind that she had no direct right to Robert's shares except, probably, by way of equitable distribution, upon divorce. Lipkind suggested an installment sale of Robert's stock to a trust as a means of protecting the money; Ann Marie and her children would be the beneficiaries of the said trust. Lipkind discussed the "Rushing Trust," and the then existing case law. Lipkind further informed Robert and Ann Marie that if the trust was created, the sale of the stock of Aero Gear by Robert to the trust had to be made in all events, regardless of whether the transaction with the Mannesmann group was consummated. Robert and Ann Marie were also apprised of the risk of making an installment sale of the *574 stock to the trust and having the proposed sale not occur, viz, that the trust would have to come up with money in accordance with the terms of the sale. With reference to the identity of the trustee of the proposed trust, Lipkind recommended that a bank be appointed trustee in order to avoid potential problems with the Internal Revenue Service. Ann Marie stated her belief that she was qualified to administer the trust as ably as any bank, and without having to pay any fees. Ann Marie's belief was based on her experience in handling the household finances and her work, as a volunteer, with the Garden State Ballet Foundation, the New Jersey Society to Prevent Blindness, the Parish Council of St. Rose of Lima, the Paper Mill Playhouse Renovation Committee, and the Deanery Council of the Archdiocese of Newark. Ann Marie has a Bachelor of Arts degree in English, Journalism, and History from St. Joseph's College in Maryland. She is a self-confident and assertive woman. The tax consequences of the creation of the trust were also discussed at the meeting between Robert, Ann Marie, and Lipkind. It was concluded that Lipking would proceed with the preparation of the documents necessary *575 for the creation of the trust. On April 3, 1978, Rexroth formed Lohmann, as its wholly owned subsidiary. On April 7, 1978, pursuant to a trust agreement between Lipkind, as grantor, and Ann Marie Failla, as trustee, the Ann Marie Failla Trust (the "Trust") was created. The trust agreement provided that should Ann Marie die, resign, be disqualified, or cease to act as trustee for any reason, Ann Marie's friend, Albert Shea, was to serve as trustee in her place, subject to Robert's right to appoint a co-trustee. The Trust was established with the transfer of 10. The beneficiaries of the Trust were Ann Marie and her children. At the time of the creation of the Trust, Ann Marie had a minor son and daughter, both of whom were also Robert's children. The trust agreement provided, inter alia, that until Robert's death, of there was another trustee other than, or in addition to, Ann Marie, that trustee had the power to, in his sole and unreviewable discretion, pay or apply to or for the benefit of Ann Marie and/or her children, equally or unequally, any of the net income and/or principal of the Trust. The trust agreement further provided that, if in the exercise of his discretion, *576 the trustee paid or applied all of the net income and principal of the Trust, the agreement, and all trusts created thereunder, would terminate. Robert had the power, under the trust agreement, to designate any individual, other than himself, or a corporate banking institution to serve as a co-trustee. At no time during Robert's lifetime were more than two trustees to be serving. Robert could remove any trustee except Ann Marie. The said right of removal was exercisable by Robert only five times during his lifetime. Except as provided with respect to Robert's power to appoint a co-trustee, the Trust created under the trust agreement was to terminate 21 years after the death of the last survivor of Ann Marie, Robert, and Ann Marie's children living at the date of execution of the agreement. The trust agreement granted very broad administrative powers over the Trust's property and the investment of the principal and interest to the trustee. Such powers were exercisable by her at such time and manner, and in accordance with such criteria, as she, in her sole discretion, deemed appropriate. By deed dated April 10, 1978, Robert and Ann Marie sold property located at 1470 Chestnut *577 Avenue, Hillside, New Jersey (the "Chestnut Avenue property"), to Ann Marie, as trustee of the Trust, for a stated consideration of $125,300, paid with a six-percent mortgage note to be paid in installments of $2,070.73, on the first day of every third month, beginning on July 1, 1978 through July 1, 1998. On April 13, 1978, Robert and Ann Marie filed an Affidavit of Consideration or Exemption with the Register of Deeds or County Clerk of Union County, New Jersey, claiming that the deed transfer of the Chestnut Avenue property to the Trust was exempt from any realty transfer fees. The Chestnut Avenue property was rental property. Ann Marie, as trustee of the Trust, reported gross rentals of $13,260 for each of the taxable years ending March 31, 1979, March 31, 1980, and March 31, 1981, and deductions (other than interest and depreciation) in the respective amounts of $6,282, $7,095, and $5,634. On April 14, 1978, Robert sold his 44 shares of Aero Gear to Ann Marie, as trustee of the Trust for a stated consideration of $880,000. Robert had a basis of $26,572 in his Aero Gear stock. For the period beginning on April 14, 1978, and ending on December 31, 1978, interest only, at *578 the annual rate of six percent on the unpaid balance, was to be paid on January 1, 1979. The unpaid balance of the purchase price was to be paid in 80 equal quarterly installments of principal and interest, at an annual rate of six percent, beginning on January 1, 1979. Payments were to be made as reflected on Schedule A attached to the sales agreement. Schedule A provided for 80 quarterly payments of $18,962.52 each. The sales agreement provided that, as collateral security for the prompt payment, when due, of all the obligations of the Trust to Robert under the agreement, the Trust granted a security interest in the Aero Gear stock to Robert. The agreement further provided that unless an event of default occurred in the payment of the installments, the purchaser would be entitled to receive any dividends and/or distributions, except such as may be received in the form of stock. The sales agreement further stated that: * * * The Stockholder has been advised of the fact that the Purchaser intends to cause the Corporation to adopt a Plan of Liquidation pursuant to the provisions of Section 331 of the Internal Revenue Code of 1954, as amended. The Purchaser *579 may so liquidate the Corporation and surrender the Corporation Stock for cancellation. Upon distribution of the assets of the Corporation, the Purchaser will grant to the Stockholder a security interest in the assets so distributed, in order to secure the then remaining balance of the purchase price. The Purchaser shall execute any and all documents which counsel for the Stockholder deems reasonably necessary for the creation of such security interest. * * * Ann Marie was never an officer, director, or employee of Aero Gear. She never had any investment or financial interest in Aero Gear prior to the purchase of Aero Gear stock by the Trust, nor did she take an active part in the affairs of Aero Gear.Ann Marie never actively engaged in any of the negotiations for the sale of the assets of Aero Gear. Stock certificate no. 15, for 44 shares of Aero Gear, was issued to Ann Marie, as trustee of the Trust, on April 14, 1978. On April 14, 1978, a trust was established by and between William Spitz and Doris Spitz, as grantors, and Herbert Zarrow, C.P.A., Raymond Zarrow, C.P.A., and Marvin Klein, C.P.A., as trustees (the "Spitz Trust"). Each of the trustees was an independent certified *580 accountant, unrelated by blood or marriage to the grantors, and had never been an employee of a corporation in which either of the grantors held a significant interest or in which one of the grantors was an executive. The sole beneficiaries of the Spitz Trust were the grantor's issue and their spouses. On April 14, 1978, Spitz sold his 56 shares of Aero Gear stock to the Spitz Trust. On April 14, 1978, the shareholders and directors of Aero Gear adopted a plan of complete liquidation pursuant to sections 331 and 337.A consent, in lieu of a special joint meeting of the directors and shareholders of Aero Gear, was signed by Herbert Zarrow, Raymond Zarrow, and Marvin Klein, as trustees-shareholders of the Spitz Trust, Doris Spitz, and Robert, as directors, and Ann Marie, as trustee of the Trust. Form 966, Corporate Dissolution or Liquidation, was signed by William Spitz, as president of Aero Gear, and filed with the Internal Revenue Service on April 14, 1978. On April 17, 1978, Berger sent drafts of the employment agreements for Spitz and petitioner and the acquisition agreement to Lipkind. These were the first drafts exchanged between the parties in connection with the sale of *581 the assets of Aero Gear to Lohmann. Five other drafts of the acquisition agreement, dated May 3, 1978, June 3, 1978, and June 28, 1978, respectively, and of the guaranty agreement, dated May 8, 1978, were exchanged by counsel to the parties. On June 30, 1978, the directors and shareholders of Aero Gear, including Ann Marie, as trustee of the Trust, executed an "Unanimous consent of directors and shareholders in lieu of a special joint meeting of the directors and shareholders of Aero Gear Machine & Tool Corporation," approving the sale of the assets of Aero Gear to Lohmann. On July 5, 1978, all of the assets of Aero Gear were sold to Lohmann. At the closing, held in Germany, the following documents were signed and executed: (1) Sales agreement; (2) Spitz employment agreement; (3) Failla employment agreement; (4) Lease for premises located at 1409 Chestnut Avenue, Hillside, New Jersey; (5) Lease for premises located at 74 Industrial Avenue, Little Ferry, New Jersey; (6) Guarantee of Rexroth; and (7) Bill of sale: Assignment and Assumption Agreement. Pursuant to the terms of the employment agreement between Lohmann and petitioner, petitioner was to be employed as vice president *582 of Lohmann for at least five years at an annual salary of $50,000, plus additional compensation based on its pre-tax corporate earnings. In compliance with the provisions of the acquisition agreement, Lohmann paid $1,925,000 in cash to Aero Gear[2] on July 5, 1978. The balance of the total purchase price of $2,750,000, or $825,000, was due to be paid on December 15, 1979. On July 21, 1978, the Trust received a distribution, in the amount of $440,000, from Aero Gear. This was the only distribution of funds to the Trust from Aero Gear during 1978. On March 6, 1979, Aero Gear was formally liquidated pursuant to a Bill of Sale. All of the assets of Aero Gear were distributed to the Spitz Trust and the Trust according to their respective stockholdings, viz, 56 percent and 44 percent. The Trust received cash and contract receivables of $485,750 over and above the $440,000 distributed in 1978. The shareholders of Aero Gear -- the Spitz Trust and the Trust *583 -- thereupon filed a "Certificate of dissolution by unanimous consent of all the shareholders of Spitz-Failla Corp." with the Secretary of State of the State of New Jersey. Ann Marie, as trustee of the Trust, invested a substantial portion of the proceeds of the July 21, 1978 and March 6, 1979 liquidation distributions in certificates of deposit and U.S. treasury bills. In so doing, Ann Marie had the assistance and advice of Louis Brisgel, an investment counselor with Shearson-American Express in Short Hills, New Jersey. Brisgel referred Ann Marie to Leslie Pollack, the chairman of Shearson Management Incorporated in New York City. Ann Marie gave approximately $180,000 of the Trust's money to Pollack, to be invested in high quality common stock. Ann Marie felt that she could handle the certificates of deposit and treasury bills, but needed the guidance of a person such as Pollack in investing in the stock market. The current assets of the Trust were invested as follows as of the following dates: 3/31/80
3/31/81
3/31/82
3/31/83
Cash
$ 276
$ 1,040
$ 991
$ 466
Certificates of Deposit
100,000
104,000
113,755
602,922
Treasury Bills
644,308
543,647
539,213
Shearson Daily Dividend, Inc.
2,068
27,145
9,591
31,404
Marketable Securities & Stock
81,905
183,798
166,495
163,278
Mortgage Receivable
46,784
42,364
37,234
Other
6,075
6,489
1,322
Receivable from Lohmann
44,000
Total
$872,557
$912,489
$878,898
$836,626
*584 The mortgage receivable shown, supra, represents a $50,000 mortgage loan, at an annual rate of interest of 14 percent, given to Spitz and Robert on a building owned by them. Other than the said mortgage loan, the Trust did not make any loans to Robert or to any business firm or entity in which Robert had an interest. On June 7, 1980, Robert N. Failla executed a waiver of the rights and powers granted to him, pursuant to the Trust agreement dated April 7, 1978, to remove any trustee other than Ann Marie. On January 23, 1981, Robert appointed Herbert Zarrow, his friend and accountant, as co-trustee of the Trust. As a result of the waiver of June 7, 1980, Robert is without the right to remove Herbert Zarrow as co-trustee. Zarrow authorized non-required distributions to the Failla children in 1981. On their joint Federal income tax return for the taxable year ended December 31, 1978, Robert and Ann Marie reported the sale of the stock of Aero Gear by Robert to Ann Marie, as trustee of the Trust, on the installment basis. [3] Robert and Ann Marie reported gain, in the respective amounts of $17,022 and $23,911 for their taxable years 1979 and 1980. [4] Robert and Ann Marie reported *585 interest income from the installment sale of the Aero Gear stock of $3,756, $39,339, and $51,199 for their taxable years 1978, 1979, and 1980, respectively. Ann Marie, as trustee of the Trust, reported a short-term capital gain from the liquidation of Aero Gear in the amount of $45,750, [5] for the taxable year ended March 31, 1979, and took interest deductions, for interest paid on the Aero Gear installment sale obligations, in the respective amounts of $50,600, $51,923, and $50,454 for the taxable years ended March 31, 1979, March 31, 1980, and March 31, 1981. In his statutory notices of deficiency, respondent charged Robert with a long-term *586 capital gain from the distributions in liquidation of Aero Gear in the amount of $899,178 for 1978, [6] and eliminated the reported interest income for years 1978, 1979, and 1980. Respondent also disallowed the Trust's claimed interest deductions relating to the Aero Gear stock installment sale obligation and eliminated the reported short-term capital gain from the liquidation of Aero Gear. OPINION This case presents still another application of the "substance-over-form" theory. Simply stated, the issue presented is whether the form in which a transaction is cast should be determinative of its tax results, or whether, on the other hand, the formalities in which the transaction was clothed should be ignored and tax treatment accorded pursuant to the actual economic substance. Respondent contends that the installment sale of Aero Gear stock by Robert to the Trust lacked economic reality and substance, was not a bona fide installment sale for purposes of section 453, and should be ignored for tax purposes. [7]
*587 Petitioners, predictably, argue otherwise. Section 453 permits taxpayers to report the income from the sale or other disposition of certain property on the installment method. [8] In Commissioner v. South Texas Lumber Co.,333 U.S. 496, 503 (1948), the Supreme Court described the installment method as a modified cash receipts basis, enacted "to relieve taxpayers who adopted it from having to pay an income tax in the year of sale based on the full amount of anticipated profits when in fact they had received in cash only a small portion of the sales price." Another reason for the enactment of section 453 was the difficult and time-consuming effort of appraising the uncertain market value of the installment obligations. Commissioner v. South Texas Lumber Co.,supra at 503; Vaughn v. Commissioner,81 T.C. 893, 907 (1983). Section 453 "spreads the taxpayer's profit on the sale over the collections by requiring the payments actually received to be included in income in the proportion that the anticipated gross profit on the sale bears to the contract price." Bittker, Federal Taxation of Income, Estates and Gifts, Vol. 4, par. 106.2.1, *588 pp. 106-2 -- 106-3 (1981 ed.) Since section 453 is an exception to the general rule that the entire amount of gain from the sale or other disposition of property is taxed to the seller in the year of the sale, it is to be construed narrowly. Vaughn v. Commissioner,supra at 907-908; *589 Pozzi v. Commissioner,49 T.C. 119, 127 (1967). Section 453 is inapplicable where the taxpayer has entered into an arrangement which is in form but not in substance a true installment sale. Griffiths v. Helvering,308 U.S. 355 (1939); Lustgarten v. Commissioner,639 F.2d 1208, 1210 (5th Cir. 1981), affg. per curiam 71 T.C. 303 (1978); Williams v. United States,219 F.2d 523 (5th Cir. 1955). The fact that one of the motives underlying the questioned transaction was a desire to save taxes, even though such motive was a major motive, however, will not prevent the transaction from being recognized for tax purposes. United States v. Cumberland Public Service Co.,338 U.S. 451 (1950); Commissioner v. Court Holding Company,324 U.S. 331 (1945). The Supreme Court Stated in Gregory v. Helvering,293 U.S. 465, 469 (1935): The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted * * *. But the question for determination is whether what was done, apart *590 from the tax motive, was the thing which the statute intended. [Citations omitted.] As we said in Fink v. Commissioner,T.C. Memo. 1982-284: Thus, the question is not whether a tax saving motive was present in structuring the transaction in question, or even whether such tax motive may have been a highly important reason for doing so; rather, the question is whether the transaction had any business reasons or economic reality aside from the tax motives -- in other words, whether what purported to happen really did happen, or whether it was a purely ephemeral shuffling of papers. Having no substance or reality beyond a desire to avoid taxes. It must also be noted that each case must be considered upon its own facts and in light of all the relevant surrounding circumstances. Bowen v. Commissioner,78 T.C. 55 (1982), affd. per curiam 706 F.2d 1087 (11th Cir. 1983)
In Rushing v. Commissioner,52 T.C. 888 (1969), affd. 441 F.2d 593 (5th Cir. 1971), two taxpayers each owned 50 percent of the stock of two corporations. The taxpayers as directors agreed to dispose of all of the corporations' assets *591 by liquidating them pursuant to section 337. Both corporations sold substantially all of their assets within the 12-month period following adoption of their plans of liquidation for cash and notes. Shortly before the expiration of the 12-month liquidation period, each of the taxpayers created irrevocable trusts for each of his children. The trusts were funded with a total of 50 shares of stock of another corporation, as a gift, with a total value of $46,784.08. A bank was appointed as trustee. While the taxpayers retained the right to remove the trustee, only a bank in which the taxpayers had no significant interest could be appointed as a replacement trustee. Five days after the creation of the trusts, the taxpayers sold their shares of stock in the liquidating corporations to the trustee for a total price of $625,000. The trustee purchased the stock by paying part cash ($7,000) and executing notes for the remainder ($618,000), payable to the taxpayers over a period of years. The notes provided for the payment of interest, at the rate of 5 percent annually, and were secured by the general assets of the trusts. In each case the total purchase price payable by the trusts was *592 an amount approximate to the anticipated liquidation distribution to be paid shortly thereafter on the stock purchased. [9] Within the 12-month statutory period, the trustee, as sole shareholder, and the taxpayers, as officers and directors of the two corporations authorized the distributions in liquidation of the assets of the corporations. The trustee collected the liquidation proceeds. The Commissioner determined that the taxpayers were not entitled to the benefits of the installment method of reporting gain, based on the contention that the taxpayers constructively received the corporate assets in liquidating distributions and sold such assets, rather than their stock, to the trusts, and assessed deficiencies for the tax on the difference between the proceeds received in liquidation and their basis in the stock. *593 In affirming our holding -- that the taxpayers were entitled to report the gain from the sale of their stock to the trusts under the installment method in section 453 [10] -- the Court of Appeals for the Fifth Circuit stated: This is not the first time that a taxpayer, in order to receive installment sale benefits, has created a third entity between himself and the ultimate source of his profit. See e.g.,Griffiths v. Helvering, 1939, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319; Hindes v. United States, 5 Cir. 1967, 371 F.2d 650 [cert. denied 386 U.S. 992 (1967)]; Hindes v. United States, 5 Cir. 1964, 326 F.2d 150 [cert. denied 377 U.S. 908 (1964)]; Williams v. United States, 5 Cir. 1955, 219 F.2d 523; Pozzi v. Commissioner of Internal Revenue, 1967, 49 T.C. 119. We think it clear from a reading of these cases that a taxpayer may, if he chooses, reap the tax advantages of the installment sales provision if he actually carries through an installment sale, even though this method was used at his insistence and was designed for the purpose of minimizing his tax. Williams v. United States,supra,219 F.2d at 527; *594 Pozzi v. Commissioner of Internal Revenue,supra,49 T.C. at 128. On the other hand, a taxpayer certainly may not receive the benefits of the installment sales provisions if, through his machinations, he achieves in reality the same result as if he had immediately collected the full sales price, or, in our case, the full liquidation proceeds. As we understand the test, in order to receive the installment sale benefits the seller may not directly or indirectly have control over the proceeds or possess the economic benefit therefrom. * * * [441 F.2d at 597-598] *595 Under this test, the trusts were held to be autonomous entities not controlled by the selling taxpayers, who retained no effective benefit or control over the liquidation dividend. The Rushing case has been followed by this and other courts in later cases where similar factual situations were presented. See e.g., Weaver v. Commissioner,71 T.C. 443 (1978), affd. 647 F.2d 690 (6th Cir. 1981); Pityo v. Commissioner,70 T.C. 225 (1978); Roberts v. Commissioner,71 T.C. 311 (1978), affd. 643 F.2d 654 (9th Cir. 1981); Nye v. United States,407 F.Supp. 1345 (M.D. N.C. 1975). [11]
In cases where it was shown that the seller under the installment contract (1) had effective control over the buyer viz, the buyer was acting as an agent of the original seller in reselling the property, or (2) the seller reserved to himself significant rights with respect to the proceeds of the buyer's later sale, e.g., where there is an escrow agreement, [12] the courts *596 have tended to find that the installment sale was a mere sham transaction, lacking economic reality and have held that the installment sale was to be disregarded for income tax purposes. See Griffith v. Commissioner,73 T.C. 933 (1980); Lustgarten v. Commissioner,supra;Trivett v. Commissioner,T.C. Memo. 1977-161, affd. 611 F.2d 655 (6th Cir. 1979); Wrenn v. Commissioner,67 T.C. 576 (1976); Pozzi v. Commissioner,supra.
In Wrenn v. Commissioner,supra, the wife bought stock belonging to her husband on the installment basis for a total price of $250,000, plus interest at an annual rate of 5 percent, payable in installments *597 over a 15-year period and resold them on the open market on the same day for $250,874. Under the terms of the installment sales contract, the wife agreed to provide her husband with a security for the payment of the agreed price by purchasing $250,000 in shares of the Fidelity Trend Fund, which she did. We upheld the Commissioner's disallowance of the installment provisions and found that the installment sale was not bona fide in nature because neither husband nor wife had any independent purpose of a business or personal nature, other than tax avoidance, for entering into the sale. Thus, this Court added an independent purpose requirement to the test articulated in Rushing v. Commissioner,supra, in judging intrafamily installment sales. Applying all these principles to the facts of the instant case, we conclude that petitioners have the better of the argument, that the transaction herein at issue was bona fide, and that Robert is entitled to report his gain from the sale of his Aero Gear stock under the installment method. Respondent contends that Robert and Ann Marie are not independent, autonomous entities. Respondent concedes that Ann Marie "has been shown to be *598 an intelligent and resourceful person," but argues that "she had never before taken an interest in Aero Gear and had never before invested any money in her own name, [and that there] is no evidence that she ever engaged in any profit seeking venture in her life." In testing the reality of sales transactions, sales between family members are scrutinized with greater skepticism than sales between unrelated parties. Vaughn v. Commissioner,81 T.C. at 908; Bowen v. Commissioner,78 T.C. at 78; Wrenn v. Commissioner,67 T.C. at 584. "This is because of the greater potential for complicity between related parties in arranging their affairs in a manner devoid of legitimate motivations." Bowen v. Commissioner,78 T.C. at 78. The cases which have applied the Rushing rationale have focused on the independence of the trustee of the trust to which the sale was made in determining whether the taxpayer had continuing control over the proceeds from the sale or, in our case, liquidation. See Pityo v. Commissioner,supra;Roberts v. Commissioner,supra.
In Goodman v. Commissioner,74 T.C. 684 (1980), *599 two taxpayers owned an apartment building. The taxpayers were the trustees of trusts created by the father-in-law of one of them and the mother of the other for the benefit of the grantors' grandchildren (the taxpayers' children). The trustees were given great discretion in their decisions on investments and distributions. The taxpayers entered into a contract to sell the apartment building to the trust on the installment basis. On the next day the taxpayers, as trustees of the trust, entered into a contract for the sale of the apartments to a third party. The sale to the trusts was closed in accordance with the contract for sale and purchase. A promissory note and mortgage, which was not recorded, were given by the trusts to the taxpayers as security for the payment of the unpaid balance of the purchase price. The sale to the third party was consummated on the next day. The taxpayers elected to report their gain on the sale of the apartment building to the trusts on the installment basis.We noted that, in making the sale, the taxpayers acted in the best interest of the trusts, that they did not have control over the proceeds of the sale or control over making the sale to the *600 third party except in their capacity as trustees, which was a capacity distinct and apart from their capacity as individual sellers of the property, and upheld the taxpayers' use of the installment method. We think that the facts herein are even stronger for petitioners than those in Goodman. Respondent contends that Goodman was wrongly decided and invites us to reconsider our holding in that case. We decline his invitation. We are satisfied that in buying the Aero Gear stock from Robert, and selling it to Lohmann, Ann Marie, as trustee of the Trust, was acting in the best interests of the Trust, and of herself and her children, as beneficiaries. Concededly, Ann Marie held no outside employment and was economically dependent on her husband for her support during the years in issue. However, this is not determinative. Ann Marie impressed us as a self-confident and assertive woman. On the record before us, we are satisfied that the Trust had the complete and unfettered legal right and ability to dispose of the Aero Gear stock as it deemed proper, and that Ann Marie was neither Robert's puppet nor his alter ego and was not actinv as his agent with regard to the sale of *601 the corporate assets and the liquidation of the corporation. The cases relied on by respondent -- Wrenn v. Commissioner,supra and Nye v. United States,supra -- are distinguishable, since these cases involved sales of property between spouses. There was no bona fide trust involved and no beneficiaries other than the wife. The courts considered it proper to determine whether the spouses were truly independent economic entities in deciding whether the selling spouse should be allowed to claim the benefits of section 453. Here, we have two separate economic entities, Robert and the Trust. [13]
Respondent argues, further, that the power, granted to Robert by the trust agreement, to appoint a co-trustee (including a "subservient co-trustee") authorized to make distributions of income and principal, constituted indirect control by him of the liquidation proceeds. Respondent argues, alternatively, that Robert could have directed this "subservient co-trustee" to distribute or withhold the distributions of income or principal, thereby *602 forcing Ann Marie to administer the Trust in accordance with his wishes. The trust agreement empowered Robert to designate any individual (other than himself) or a banking institution to serve as co-trustee, and to remove such trustee. Although Robert executed a waiver on June 7, 1980, he had the aforesaid rights during the years in issue. The record contains evidence that the aforesaid provisions were incorporated by Lipkind, Robert and Ann Marie's attorney, in order to avoid the inclusion of the Trust's corpus in Ann Marie's estate upon her death on the basis that she had a general power of appointment. See section 2041. Even assuming, arguendo, that the retention of these rights by Robert was done with the intention, and had the effect, of retaining indirect control over the liquidation proceeds, Herbert Zarrow was not appointed co-trustee by Robert until January 23, 1981, 2-1/2 years after the sale of the assets of Aero Gear to Lohmann and almost 2 years after Aero Gear was formally liquidated. While actions of the parties subsequent to the transaction herein at issue may be considered to the extent that those actions cast light on their intentions, respondent's argument *603 is not based on what really happened, but on what could have happened. A co-trustee was in fact appointed by Robert, and respondent does contend that Zarrow was subservient to Robert's wishes. We therefore reject the arguments advanced by respondent. The second prong of the test enunciated in Rushing v. Commissioner, 441 F.2d at 598, requires us to determine whether Robert possessed the economic benefit from the liquidation proceeds. Respondent argues that the liquidation proceeds, held in trust for the benefit of Ann Marie and her issue, were to remain within the family group, and were to benefit the family group. A benefit to Ann Marie and her two children (who were also Robert's children), the argument follows, is also a benefit to Robert. In response to respondent's argument, suffice it to say that Rushing v. Commissioner,supra, involved trusts created for the benefit of taxpayers' children. In applying the "economic benefit" prong of the test therein articulated, the Fifth Circuit did not attribute any importance to this fact. We do not think that this was due to oversight. Robert received only what section 453(b) entitled him to, a tax benefit. *604 At no point could Robert have obtained possession of the liquidation proceeds in dispute. If we were to follow respondent's reasoning, Rushing v. Commissioner,supra; Weaver v. Commissioner,supra;Pityo v. Commissioner,supra;Davidson v. Commissioner,T.C. Memo. 1981-467; and Wilson v. Commissioner,T.C. Memo. 1980-288, would be overruled since they involved taxpayer's sale of stock on an installment basis to an irrevocable trust established for his family's benefit. Indeed, respondent concedes that "[t]here is no way [that] Robert could have obtained the Trust principal or income for himself." We are also satisfied that there was a purpose other than tax-avoidance for the transactions herein at issue. This purpose was to provide for Ann Marie and the children, and to shield the Aero Gear stock from the risks associated with Robert's business ventures. Respondent further contends that the sale of the assets of Aero Gear and the liquidation of the corporation were necessary steps of a prearranged plan. [14] The prearranged plan argument only makes sense when a straw man is used as a conduit *605 between the seller and the purchaser. See Griffith v. Commissioner,supra. Respondent has made no contention that there was any plan between Ann Marie and Lohmann. We also note that it was after (1) the taxpayers agreed, as shareholders and directors, to liquidate the corporations pursuant to the provisions of 337 and (2) substantially all of their assets were sold, that the taxpayers sold their stock in the corporation to the trustee of the trusts in Rushing v. Commissioner,supra.[15] Within a day the trusts authorized the corporations to distribute their assets in liquidation. In the instant case, nearly 3 months elapsed between the sale of the stock of Aero Gear to the Trust and the sale of the assets.The record contains evidence that the Board of Directors of Mannesmann was required to approve the transaction, and that the matter was not submitted to Mannesmann until June of 1978. Even if Robert expected Ann Marie, as trustee, to sell the assets of Aero Gear and to liquidate the corporation, the Trust was created *606 and the stock sold to it free of any precommitment for resale of the stock or assets to any third party. Respondent points to the fact that the Trust contained assets insufficient to meet the obligations under the installment sale as additional evidence of prearrangement. Again, in Rushing, the total value of the assets transferred to the six trusts was $46,784.08. As a result of the installment sale of the stock of the two corporations to the trusts, obligations in the total amount of $625,000 resulted. The cases cited by respondent are distinguishable. In Lustgarten v. Commissioner,supra, we relied on the fact that the proceeds of the sale were held in escrow in disallowing taxpayer's use of the installment method, not on the buyer's (taxpayer's son) inability to make the installment payments. Vaughn v. Commissioner,supra, similarly involved an escrow agreement. We also do not find fatal to petitioners that the Trust gave a mortgage in the amount of $50,000, providing for a 14 percent rate of interest to Robert and Spitz.The amount is minimal, as compared to the liquidation proceeds, and the installments were being paid. *607 Finally, petitioners requested in their petitions that we award them litigation costs pursuant to the provisions of section 7430. As the instant proceeding was commenced after February 28, 1983, we have the authority to award "reasonable litigation costs," if appropriate. Section 7430, enacted by section 292(a) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 572. Rule 34 provides, in pertinent part, that "[a] claim for reasonable litigation costs shall not be included in the petition in a deficiency or liability action." In general, the time for making such claims is after the substantive issues have been resolved. Should petitioners desire to pursue this matter, they must comply with Rules 230 and 231. To reflect the foregoing, as well as concessions made by the parties in docket No. 29077-83, Decision will be entered under Rule 155 in docket No. 29077-83.
Decision will be entered for the petitioner in docket No. 29078-83.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. On July 5, 1978, the certificate of incorporation of Aero Gear was amended and the name of the corporation was changed to "Spitz-Failla Corp." For clarity, however, we will continue to refer to the corporation as Aero Gear.↩
3. Robert and Ann Marie realized a gross profit on the sale of the Aero Gear stock, as follows: Sales Price
$880,000 Basis
(26,572)
Gross Profit
$853,428 The gross profit ratio was .97; no taxable gain was reported for 1978, because no principal payments were made to them by the trust in that year. ↩
4. Based upon principal payments received of $17,548 and $24,651.↩
5. Computed as follows: ↩
Amount received in
liquidation
$925,750 Basis in Aero Gear Stock
(880,000)
Gain
$ 45,750 6. Computed as follows: ↩
Liquidation distribution
$925,750 Basis in Aero Gear stock
(26,572)
Long-term capital gain
$899,178 7. On brief, respondent contends that Robert had long-term capital gains as follows: 1978
1979
Liquidation Distribution
Amount received on July 5, 1978
$440,000 Amount received on March 6, 1979
$485,750
Basis in stock
($26,572)
0   Long-term capital gain
$413,428 $485,750
We note that such position is contrary to respondent's determination in his statutory notice to Robert and Ann Marie, and that respondent did not issue a notice of deficiency to Robert and Ann Marie for their taxable year 1979. Given our disposition of the case, no further comment is necessary.↩
8. Sec. 453 provided, in pertinent part, as follows during the years in issue: Sec. 453. INSTALLMENT METHOD. (b) Sales of Realty and Casual Sales of Personalty.-- (1) General Rule.--Income from-- (A) a sale or other disposition of real property, or (B) a casual sale or other casual disposition on personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000, may (under regulations prescribed by the Secretary) be returned on the basis and in the manner prescribed in subsection(a). (2) Limitation.--Paragraph (1) shall apply only if in the taxable year of the sale or other disposition-- (A) there are no payments, or (B) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.↩
9. Both corporations transferred in liquidation all assets and liabilities to the trustee as sole shareholder. The main assets of one of the corporations was a note in the principal amount of $325,456.50 and an account receivable of $75,931.12. The main asset of the other corporation was a note in the approximate amount of $322,875. The total is $724,262.62. See Rushing v. Commissioner,52 T.C. 888, 892-893 (1969), affd. 441 F.2d 593↩ (5th Cir. 1971).
10. Sec. 453 was amended by sec. 2(a) of the Installment Sales Revision Act of 1980, Pub. L. 96-471, 94 Stat. 2247, with respect to dispositions of property made after May 14, 1980, to provide that when a person disposes of property to a related person, as defined in sec. 318(a) (other than paragraph 4 thereof), and before the person making the first disposition receives all payments with respect to such disposition the related person disposes of the property, then the amount realized with respect to the disposition of the property by the related person shall be treated as having been received by the person who disposed of the property to the related person. We are not concerned in this case with whether the facts here would fall within the provisions of the amendment since the committee reports specifically provide that "[t]he committee intends that no inference be drawn from these provisions as to the proper treatment of any related party installment sale occurring prior to the effective date provided under the bill." H. Rept. 96-1042 to accompany H.R. 6883 (Pub. L. 96-471, 94 Stat. 2247) (1980); S. Rept. 96-1000, at 17 (1980), 1980-2 C.B. 494↩, 503. The amendment of sec. 450 by sec. 403(d)(4)(B) of the Crude Oil Windfall Profit Tax Act of 1980, Pub. L. 96-223, 94 Stat. 229, 305, is also inapplicable to the facts herein.
11. See also Davidson v. Commissioner,T.C. Memo. 1981-467; Wilson v. Commissioner,T.C. Memo. 1980-288↩.
12. The payment of funds by a purchaser into an escrow account results in the constructive receipt of such funds by the seller if (1) the funds are not subject to substantial conditions or limitations other than time of payment, and (2) the seller expects to collect from the funds placed in escrow. Griffith v. Commissioner,73 T.C. 933, 943 (1980); Oden v. Commissioner,56 T.C. 569↩ (1971).
13. We are satisfied that the Trust is not a sham created only for tax purposes, and must be respected.↩
14. See Rev. Rul. 73-157, 1973-1 C.B. 213↩. 15. A total of six trusts were created. See 52 T.C. at 892↩.